# CHARLESTON.

## STATE v. SOUTH PENN OIL CO.

Submitted June 12, 1894, Reargued and Resubmitted June 10, 1895—Decided April 4, 1896.

1. ASSESSMENT OF TAXES—LEGISLATIVE POWER.

The imposition of taxes, and the law directing the mode of assessment and collection, are the exercise of legislative power, to be exercised in conformity with the requirements of the Constitution, by general law.

2. ASSESSMENT OF TAXES—COUNTY COURT—JUDICIAL ACTS.

When the question of the legality or illegality of the listing of property on the land books for taxation comes before the county court for correction, on the application of the party assessed, who feels himself aggrieved, the county courts acts, in review of the action of the commissioner of reassessment, as an administrative board; and such action of the county court is not "judicial," within the meaning of section 24 of article VIII of the Constitution.

3. ASSESSMENT OF TAXES—CIRCUIT COURT—JUDICIAL POWER.

When the issue on such controversy is made up between the

applicant and the state for the purpose of appeal to, and decision between such parties by, the circuit court, as to the right and legality of such assessment litigated between them, in the mode and according to the proceeding prescribed by law in such case for contesting the right claimed, and deciding the controversy, the orders and judgment of the circuit court are made and rendered in the exercise of its judicial power, in the proper and ordinary sense.

4. MINING PRIVILEGES—FREEHOLD INTEREST—ASSESSMENT OF MINING PRIVILEGES.

A privilege or liberty or license to search and explore the land for oil or other minerals, coupled with a grant to dig and remove them, and convert them to the grantee's own use, if in fee or for life, creates an incorporeal freehold right in the real estate, which may be assessed to the grantee separately from the land or its surface, and, if the minerals be found and produced, creates a freehold interest, which should be assessed separately on the land books, under the act of February 27, 1891 (chapter 36) entitled "An act to provide for the reassessment of the value of all real estate within this state."

5. MINING PRIVILEGES—ESTATE FOR YEARS—ASSESSMENT OF MINING PRIVILEGES.

But such privilege, liberty, or license, and such interest, if limited to a term of years, are not held and owned as the whole or a part of a freehold ownership, within the meaning of the act, and should not be separately assessed to the mining licensee or lessee on such land books.

A. B. FLEMING and U. N. ARNETT for plaintiff in error, cited 36 W. Va. 341; 38 W. Va. 201, 338; 28 W. Va. 264; 39 W. Va. 142; 135 U. S. 467; 152 Pa. St. 82, 451; Acts 1891, c. 36, s. 4; Code, c. 29, ss. 8, 25; Code, c. 13, s. 17; 2 Black. Comm. 104; 2 Kent, Comm. 342; 37 Pa. St. 427; 29 Pa. St. 373; 31 Pa. St. 475; 105 Pa. St. 469; 27 W. Va. 785; 89 Pa. St. 47; 8 Pa. St. 272; 53 Pa. St. 229; 63 Pa. St. 397; 55 Pa. St. 164; 32 Pa. St. 41, 367; 101 Pa. St. 235; 129 Pa. St. 94; 120 Pa. St. 590; 107 Pa. St. 57; 77 Pa. St. 103; 11 Atl. Rep. 453; 2 Cleveland Reports, 133; 25 N. J. L. 106; 9 Pa. Cty. Ct. Reps. 56; 95 Pa. St. 474; 36 Vt. 193; 92 Pa. St. 123.

ATTORNEY-GENERAL T. S. RILEY for the state, cited Acts 1891, c. 36; Const. Art. VIII, s. 3; 28 W. Va. 264, 271; 135 U. S. 467; 38 W. Va. 201, 338; 39 W. Va. 142; Const. Art. X, s. 1; 39 W. Va. 231; 105 Pa. St. 469; 4 Cruise, Dig. 62; 63 Pa. St. 397; 152 Pa. St. 451; 57 Pa. St. 83; 107 Pa. St. 57.

L. G. BENNINGTON for the state, cited Acts 1891, c. 36; Const. Art. VIII, s. 3; Const. Art. X, s. 1; 6 Ohio Cir. Ct. R. 326; 88 Pa. St. 198; 109 Pa. St. 583; 130 Pa. St. 235; 128 Pa. St. 485; L. R. 2 Sc. & D. Ap. 284; 94 U. S. 267, 762; 11 Casey, 287; Leake, Conts. 55; 7 Ex. C. 379-94; 12 Cal. 56

HOLT, PRESIDENT:

This is a controversy involving the legality of listing and assessing on the land book of Marion county, for purposes of taxation, certain oil and other mineral leases of the South Penn Oil Company, involving the right of the county to levy taxes, as well as relating to the public revenue. The leases seem to be one hundred and more in number, of lands lying in Marion and Wetzel counties, and perhaps in other counties. This suit or proceeding relates to the leases in Marion, though it appears from a written opinion of Judge Jacobs, of the Fourth judicial circuit, filed with applicant's brief, that a similar proceeding was had in the county of Wetzel, and decided by him at the January term, 1893; but none but the case from Marion is before us.

In this case the commissioner of reassessment listed the property in question. The owner, feeling himself aggrieved that his property was listed for taxation, and claiming that it should not, under the law, have been assessed at all, applied to the county court for redress, after having given the prosecuting attorney of Marion, who was the attorney of the county as well as of the state, reasonable notice in writing of his intended application, stating, as the character of the redress it desired, that it would move the county court to enter such order as would wholly relieve the company from such assessment as erroneous and illegal. Such proceedings were had as that the county court, on the 8th day of June, 1892, entered an order that the applicant be wholly relieved and exonerated from such assessments as wholly erroneous and illegal, and ordered them to be stricken from the commissioner's book of assessment. From this order the state appealed to the circuit court, as provided for by the act of February 27, 1891, the act in question, entitled "An act to provide for the reassessment of the value of all real estate within this state" (see Acts

1891, p. 60); and, to the end that such appeal might be taken, the applicant and the state had the evidence taken at the hearing of the application certified by the county court. The appeal was allowed by the judge of the circuit court of Marion county; and, coming on to be heard, that court, on the 21st day of March, 1893, reversed and annulled the order and judgment of the county court, with such costs against the appellees as the statute prescribes, and denying the applicant the relief prayed for. From this judgment a writ of error to this Court was allowed the South Penn Oil Company.

In the assessment of taxes in this state, the law has always required two separate and distinct books to be made and kept—one designated the "Personal Property Book," in which the values for taxation are ascertained in each year, as to ownership and value, as of the 1st day of April; the other, the "Land Book; Tracts of Land; Town Lots."

On the land book the assessor lists and puts down the land, in the name of the legal owner, on the 1st day of April of each year, putting it on in the name of the new owner, making the transfers from the former owner, and leaving it off in his name; "and, as to real property, the person, who, by himself or his tenant, has the freehold in his possession, whether in fee or for life, shall be deemed the owner for the purpose of taxation." Code 1891, c. 29, s. 40. See the whole chapter, which relates to assessment of taxes. The assessor makes the proper corrections according to the facts, omitting where improperly charged, and charging where improperly omitted; correcting such errors and mistakes as he may discover in any such land book as to the names of persons properly chargeable with taxes on any tract or lot of land entered therein, and entering and charging the same with taxes therein to the person or persons properly chargeable therewith, whether such correction be rendered necessary by conveyance by the person last charged or otherwise, such as clerical errors of every sort, and mistakes in local description. So, also, the clerk of the county court, when he makes out the land book for the assessor, is to correct any and every mistake in the original land book he may discover. The assessor

in each year is to assess and enter in the land book in his possession the value of any old building omitted for one or more years, and of additions or improvements to a building, and of any building newly erected, not theretofore assessed, if the same be of the value of one hundred dollars or upward (see Code, c. 29, ss. 27-29) and also assess the value of omitted lands by him entered, ascertaining such values by contiguous lands, as directed by chapter 29, section 10.

But with these exceptions, he does not ascertain or fix the value of the lands, but takes them as he finds such values, as assessed in the previous general reassessment. Such reassessment it has been the policy of the state to make once about every ten years. In pursuance of this policy, the act of reassessment of February 27, 1891, was passed, under which this controversy arises; and it is that statute and the Constitution and laws in pari materia with the points involved that we are called upon to read according to their meaning and effect, and apply to the facts, as in the pleadings and evidence they appear.

About the material facts no controversy is or can be made, for the evidence is documentary; and the question of their meaning and effect in law is a question for the court. They are all what are called oil and gas leases, are about forty in number, and, being all essentially alike in their bearing on the matter in controversy, one will answer for all:

"This lease, made this fifth day of August, 1889, by and between E. M. Parrish, of the county of Marion, State of West Virginia, of the first part, and T. M. Jackson & Co., of the second part, witnesseth: That the said party of the first part, in consideration of the stipulations, rents, and covenants hereinafter contained on the part of said party of the second part, to be kept, paid, and performed, hath granted, demised, and let unto the said party of the second part the exclusive right to mine, bore, excavate, and produce petroleum, rock, or carbon oil, and gas, or other valuable or volatile substances, and the exclusive right to lay and maintain lines of pipes under or on top of said surface for transportation of said oil, gas, or other substance from

the land herein conveyed, and over it from other lands owned, leased, or controlled by said party of the second part, all of that certain tract of land situate in the district of Lincoln, in Marion county, state of West Virginia, on waters of Modd's run, and bounded as follows, to wit: On the north by lands of John Reese, on the east by lands of Rezin Amos, on the south by land of John Regan, on the west by lands of Mrs. N. S. Beatty ; being all the land owned by said party of the first part at said place, containing about twenty five acres, more or less, excepting and reserving therefrom five (5) acres around the dwelling house on said premises, to be selected and laid off by said party of the first part in a square boundary when requested to do so by said party of the second part, upon which there shall be no mining, boring, or excavating—to have and to hold the said premises, for said aforesaid purposes only, for, during, and until the full term of ten years next ensuing the date of this lease, or as long as oil and gas may be found in paying quantities. And the said party of the second part hereby covenants, in consideration of said grant and demise, to deliver unto said party of the first part, their heirs or assigns, in tanks or other receptacles furnished by said party of the second part for that purpose, the full equal one-eighth part of the petroleum, rock, or carbon oil excavated, pumped, and raised on the premises herein leased as produced in crude state ; or the parties of the second part agree to sell the oil, and pay to the party of the first part one-eighth of the net proceeds, as the party of the first part may elect. If gas, instead of oil, is found and utilized, said party of second part is to pay two hundred dollars per annum for each well so utilized. The said party of the first part to fully use and enjoy the said premises for the purpose of tillage, grazing, and farming generally, except such part as shall be necessary for said mining, boring, excavating, and producing purposes, and such part thereof as may be required for a right of way to and from the place or places of mining, boring, excavating, and producing, and also excepting so much thereof, along said right of way as far as practicable, as may be needed for erecting and maintaining telegraph and telephone lines, or both, as may be found

necessary by said party of the second part in carrying on the business herein provided for. The said party of the first part grants to the party of the second part the right to remove any machinery, buildings, or fixtures placed on said premises by said party of the second part. The said party of the second part is to have the privilege of using sufficient water from said land to run the necessary engine for the prosecution of said business. The party of the second part covenants to commence operations for a test well within six months on Modd's run, and complete the same one year from the date hereof, at some point in said district of Lincoln, Marion county, and complete the same within one year from said commencement, provided that unavoidable delay occasioned by mishaps in drilling shall not cause a forfeiture of this lease; and, in case said party of the second part fails to so commence and complete said test well, the lease shall be forfeited and void; and, in case said test well is a success, said party of the second shall commence a well on the property herein conveyed within two years after said test well is utilized, and complete the same within one year from the commencement thereof; and, if said party of the second part fails so to do, this lease shall be forfeited and void, provided that loss of time spent in the recovery of tools lost in drilling or unavoidable delays occasioned by any mishaps in connection with drilling shall not work a forfeiture of this lease. First party to receive one dollar for each and every acre mentioned in this lease, until well is completed on these premises. It is understood and agreed that gas used in the operation of wells on the land herein conveyed is to be free, and not of itself to constitute utilization of the well under this lease, and also that the party of the first part shall be entitled to gas for his own domestic uses free of charge, by making his own connections at the well or other point, as designated by the party of the second part. It is further agreed that the party of the second part shall pay all damages that may accrue by reason of operations under this lease to the growing crops or the fences of the party of the first part. It is also understood that all conditions and stipulations, rights, and privileges herein made and provided for shall extend to the heirs, executors,

administrators, assigns, and lessees of the parties hereto.
In case the party of the first part ever permits any mining,
boring, or excavating on the land herein reserved during
the continuance of this lease, the party of the second part
shall have the sole right and privilege of doing the same,
at the same rents, royalties, and privileges· as herein set
forth.    In witness whereof, the said party of the first part
hereunto set ———— hand and seal, the day and year first
above written.

his
"E.  X  M. PARRISH.      [Seal.]"
mark.

The appellant contends that by these leases, it appears
that the oil company is but a tenant for years, and is not
the owner of a freehold in fee or for life; that they do not
work a separation in ownership for any freehold interest of
the mineral oil *in situ* from the surface—the land as one
corpus; that the corpus of the oil does not belong to the
lessee, and the surface to the lessor; that there is therefore
no divided ownership; and that, there being no divided
ownership, so, within the meaning of the act, there can be
no separate listing and assessment.    This is the question
on the merits; but it is contended that it can not be reached
in this Court, and in this way, for want of jurisdiction.

When a judge, as such, or a court of justice, in a suit be-
tween parties, ascertains facts, ascertains and applies there-
to the law, decides the controversy, and renders judgment,
he has exercised judicial power, and in such exercise has
done a judicial act.    How much can be left out, or to what
extent the above can be limited and qualified, and still have
it a judicial act, in the proper sense, or make it *quasi* ju-
dicial, is not easy to say.    Many acts are now performed
and decisions made by administrative officers, and boards of
commisioners which are termed "*quasi* judicial"; and such
administrative or *quasi* judicial duties seem to be largely on
the increase.    The term implies that the act has some of the
marks of a judicial act, and lacks some.    The term pre-
supposes both resemblance and difference.    But what el-
ement it must contain to be *quasi* judicial it is not easy to
determine on principle.    We only know that it does not
possess all the class characteristics of a judicial act proper.

The statute in question is entitled "An act to provide for the reassessment of the value of all real estate within this state"; and section 1 provides that "the board of public works shall appoint one commissioner for each assessment district in the several counties of this state, who shall be a resident freeholder of such district, * * * whose duty it shall be to reassess the value of all real estate therein." He shall at once take the oath of office prescribed, give bond, qualify, and enter upon his duties. The auditor shall, as soon as possible, cause to be provided for each commissioner three books, similar in form to the assessor's land books, with such changes as the nature of the work requires, and shall also furnish each commissioner with instructions describing in detail the manner in which they are to arrive at proper valuations of the real estate, under the provisions of this act, and the manner of making up their books and returns. Then comes section 4 (all that need be given in full) which reads as follows: "Each commissioner so appointed and qualified shall on the first day of April, 1891, or as soon thereafter as practicable after receiving the books and instructions to be furnished by the auditor, and which shall be sent to the clerk of the county court of each county and be by him delivered to the commissioner, proceed to examine in person, all the tracts of land and town lots, with buildings and improvements if any, thereon, within his district, and shall upon examination and in accordance with his said instructions and the provisions of this act, ascertain and assess the fair cash value thereof, and in such assessment the minerals, mineral waters, oils and gasses underlying the surface and the location of the the land, shall be considered in ascertaining the value of such land in current money, and when mineral, mineral water, oil, gas, or coal privileges or interests are held by a party or parties, or any company or association, exclusive of the surface, the same shall be assessed seperately to such party or parties, company or association, at its cash or market value at the time of such re-valuation; and the said commissioner, in order to assist him in ascertaining and fixing the value of said lands and mineral rights, shall, when practicable, examine the owner of said lands or,

in his absence, his local agent, and also the owner of adjacent lands under oath, and he shall act in all cases upon his own judgment and upon all the information he can obtain as to such value. And when the timber or any part of it is held by any person, company, firm or corporation, on any tract of land, and the land is owned by another person, firm or corporation, and such fact shall appear in any way upon record in the office of clerk of the county court wherein the land is, said timber shall be assessed separately to the owner thereof at its fair cash or market value, at the time the same is made. And the said assessor shall have the same power to examine the owner of such timber and other witnesses as to the value thereof, as is herein provided for in relation to assessment of minerals; and in case the owner of such timber has failed to record his evidence of title thereto, the owner of such tract of land may make and file an affidavit showing him to be the owner of such timber, in the office of the clerk of the county court wherein such timber may be situated; and the clerk of said court shall record the same in his office and such affidavit, when so recorded, shall be sufficient evidence on which to authorize the said assessor to assess said timber against said owner. In ascertaining and fixing the value of any land within the limit of any city, town or village, when laid off into, or offered for sale in lots, and when in any case land is laid off into lots, the said commissioner shall adopt as the value of such land the value thereof as so laid off into such lots, valuing the same by the lot and not by the acre or tract. And to further assist him, the commissioner may require the owner of the land to produce the lease, deed or title bond or other evidences of title for examination, and he shall obtain from the clerk of the county court, a copy of the land books of the district he is to assess made for the year one thousand eight hundred and ninety, and where completed for the year 1891, and carry it with him for reference in making this assessment." He is to examine in person all tracts of land, *etc.*, is required to examine the owner or his agent on oath, administer the same, and set on foot and prosecute all inquiries into facts pertinent to the purpose and requirement of the act. It may be correctly

said, perhaps, that the decisions of such a commisioner are of a *quasi* judicial character, and can not be questioned collaterally when made within the scope of his jurisdiction. See *Clinkenbeard* v. *U. S.*, 21 Wall. 65, 70. But the commissioner is not a judge, in the proper sense; nor does he decide between parties, in the proper sense; but he administers a revenue law, and therefore must ascertain facts, interpret and apply the law thereto, and decide to enter or not to enter a given tract of land on the land book for taxation—taxation by the county as well as by the state. To that extent, his act is like the act of the judge, and his power to perform such act is judicial; but there are no pleadings, and he enters no judgment against any one directly or by name. The effect of the entry he makes is declared generally. He has administered the law, but has not administered justice in any concrete case. But it has the effect of determining and fixing for purposes of taxation the status of a given lot of land, as against a given person. The law has required him to give the owner actual notice of the proceeding in all cases where it is practicable. The owner in this case has had such notice, and feeling himself aggrieved by the assessment as an illegal one *in toto*—not that the property was assessed at a value too high, but that it was assessed at all—in pursuance of section 7 of the act, and within the year, made his written application to the county court for relief, as already stated.

By the Constitution of 1872, the county court was given original jurisdiction in all actions at law where the amount in controversy exceeded twenty dollars; also, in *habeas corpus, quo warranto, mandamus,* prohibition, and in all suits in equity, and in criminal cases under the grade of felony; also; in such matters as are prescribed by the present Constitution. But being thus a court of original general jurisdiction, also a court of appeal from decisions of justices, it was provided that its jurisdiction should be subject to such limitations as might be prescribed by law. See Acts 1872-73, p. 30; Const. 1872, art. VIII, ss. 27, 28. On the second Tuesday in October, 1880, article VIII, relating to the judicial department, was amended and adopted so as to read as

we now find it (see Acts 1883, p. 189; Code W. Va. 1891, pp. 37, 41; and Acts 1879, p. 176); and in the main it is as it was before, with what I have quoted above omitted, and, instead of saying that the jurisdicton of the county court shall be subject to such limitations as may be prescribed by law, it now reads: "Such courts may exercise such other powers and perform such other duties, not of a judicial nature, as may be prescribed by law;" thus reducing it to a court of special limited jurisdiction. It still has jurisdiction in all matters of probate and of contested elections of county officers, and some other powers, perhaps, of a nature purely judicial; but its powers have been cut down, until they consist in the main of the superintendence and administration of the internal police and fiscal affairs and other affairs of the county, such as establishing roads, and laying and disbursing the county levies, and other powers and duties of a *quasi* judicial nature, and among them the power exercised in this case, of correcting the errors and annulling an illegal assessment for taxation made by the commissioner of reassessment; and such correction is made on the written application of the party aggrieved.

On the appeal taken to the circuit court from this decision of the county court, what power did the circuit court exercise in this case of supposed illegal listing for taxation, and what was the nature of the judgment in terms rendered by the circuit court? Was it an act judicial in the proper sense, or only *quasi* judicial? Supposing the listing to be illegal, there can be no question of the injury done to the oil company in their rights of property, and no question of their right to a remedy by due course of law before some proper court. They can not have it against the commissioners of the county court or the commissioner of reassessment, for confessedly they acted in good faith, *quasi* judicially, and within the scope of their jurisdiction; and, for the same reason, not by suit against the collecting officer; not by writ of *certiorari* from the circuit court, for an appeal to the circuit court is expressly given by the act, and the remedy by *certiorari* is expressly taken away for that reason by section 3 of chapter 110 of the Code, regulating and enlarging the use and scope of that remedy; not in

equity, at this stage at least, for the same reason.   But
what necessity is there for regarding the appeal and pro-
ceedings thereon in the circuit court as *quasi* judicial, and
not judicial, in the technical and proper sense?   Now, when
it comes into that court, we have two parties formally ar-
rayed against each other on opposite sides of the record.
The pleadings have been made up, and the issue joined on
the *lis mota*—was the entry on the land books for purposes
of taxation legal or illegal?   And all the evidence has been
certified for the very purpose of having the facts ascer-
tained, the law declared and applied, and justice adminis-
tered, in a concrete case of controversy *inter partes*, by a
judge and court clothed with general and original judicial
power in the true and proper sense, and following judicial
forms and methods of procedure.   The *quasi* judicial tri-
bunal has put the controversy in the form of a case special-
ly fitted for the decision of a judicial tribunal—"judicial"
in the proper sense.   Then, why is not his formal judg-
ment a judicial act?   A proceeding by writ of *certiorari* is
a "judicial" proceeding, in the technical sense, as distin-
guished from a "*quasi* judicial" one; and, apart from its
ancillary use, its main purpose and its commonest use is to
supervise, control, review, and correct the proceedings of
*quasi* judicial tribunals, or where such proceedings are dif-
ferent from the course of the common-law.   2 Bac. Abr. 163;
Harris, Certiorari, § 1 *et seq.;* 2 Spell. Extr. Relief, § 1890
*et seq.*   Our Code (chapter 110 s. 3 *et seq.*) has extended the
scope of this writ, and increased its usefulness, by enlarg-
ing and improving its procedure, making the evidence a
part of the record, for the very purpose of making it a writ
of review of the judgment, order, or proceeding of the
county court, council, justice, or other inferior tribunal,
many of which exercise for the most part a solely *quasi*
judicial power.   How can it be said, therefore, that because
the proceeding reviewed is *quasi* judicial, the proceeding
in review must also be *quasi* judicial, when the appeal al-
lowed to the circuit court by the act 1893 is in form and
substance and method of procedure similar to the statutory
writ of review by *certiorari?*   I know of no decision on the
point of illegal listing holding otherwise; but, on the con-

trary, in the case of *Bank of Bramwell* v. *Mercer Co. Ct.*, af-
ter elaborate argument, it was held, by plain inference at
least, to have been on the part of the circuit court the ex-
ercise of judicial power in the proper sense—see 36 W. Va.
341 (15 S. E. 78) (1892)—it being held to be a civil case,
where the matter in controversy was of greater value and
amount than one hundred dollars, thus giving this Court
jurisdiction, under section 3 of article VIII of the Constitu-
tion.   See *Neal* v. *Com.*, 21 Gratt. 511.   And in the case of
*United States Coal, Iron & Manuf'g Co.* v. *Randolph Co. Ct.*,
38 W. Va. 201 (18 S. E. 566) a case of illegal separate list-
ing of the coal under the statute here involved, a case on
all fours with this in its facts, the same point arose and was
ruled in the same way.   In *Mackin* v. *Taylor Co. Ct.*, 38 W.
Va. 338 (18 S. E. 632) the character of the power of taxa-
tion was examined and discussed, but the only point de-
cided was that the county court was not a party to the ap-
peal in the circuit court, and had not the right of appeal
and, not being a party to the proceeding in that court, had
no standing in this Court; that the appeal to this Court was
improvidently allowed; that at this stage, there being no
longer an appellant, there could continue to be no appellee;
and that no other question could thereafter arise upon the
record to be decided between parties who were thencefor-
ward treated as out of court.   But the useful research and
discussion of the general subject of the power of taxation
and revaluation was properly preserved in permanent and
convenient form, the points examined being put as queries,
but in that case the matter that the state complained of
was improper reduction in assessed value.   In the case of
*Railway Co.* v. *Paull*, 39 W. Va. 142 (19 S. E. 551) (a case
of *mandamus*) it was held that the statute of reassessment
in question, giving the right of appeal to the circuit court
to the state and the injured party, was constitutional and
valid; and that the circuit court must entertain the appeal,
and in some way act, without expressly deciding whether
such action would be in the exercise of judicial power, as
distinguished from *quasi* judicial, the term used being the
general one.   This was a case not of illegal assessment for
taxation, but of excessive appraisement of value; and the

court held that the circuit court had jurisdiction, leaving undecided the question whether its review of an excessive appraisement was a judicial or *quasi* judicial act. In *Low* v. *Lincoln Co. Ct.*, 27 W. Va. 785, it was held that on appeal from the county court to the circuit court, on application to correct an assessment, where it was claimed that the party assessed with taxes was not chargeable therewith, the circuit court had jurisdiction. In *Pittsburg C. & St. L. Ry.* v. *Board of Public Works*, 28 W. Va. 264, it was excessive appraisement of railroad property made by the board of public works that the railroad complained of, and appealed to the circuit court to decide upon and correct. The court held that the action of the circuit court in supervising the decision of the board of public works as to the assessment and valuation of railroad property for taxation, under the provisions of chapter 52, Acts 1883, was merely administrative, and not judicial. The point as to illegal listing did not arise; for, under that act, the appeal to the circuit court was given only to the railroad, and only in cases where it claimed to be aggrieved by excessive appraisement of value. No attempt was made to give appeal to this Court, but the appraisement made by the board of public works as an administrative functionary of original jurisdiction was to be final, unless the railway company appealed therefrom in thirty days to the circuit court. In the case of *Upshur Co.* v. *Rich*, 135 U. S. 467 (10 Sup. Ct. 651) no question was involved save the one of excessive appraisement of value. As to that the court held that an appeal under a state law from an assessment of taxes to a "county court," which, in respect to such proceedings, acts not as a judicial body, but as a board of commissioners, without judicial powers, only authorized to determine questions of quantity, proportion, and value, is not a suit which can be removed from the county court into a circuit court of the United States, and be heard and determined there. Justice Bradley, in discussing the question, does allude to the case here involved, *viz.* the one of illegal assessment, for purposes of taxation, and on page 473, 135 U. S., and page 651, 10 Sup. Ct., says: "At the same time we do not lose sight of the fact, presented by every day's experience, that the legality and con-

stitutionality of taxes and assessments may be subjected to judicial examination in various ways, * * * by *certiorari"* etc. We have already seen that the writ of *certiorari*, if awarded by the circuit court to a *quasi* judicial proceeding, would itself be tried in the exercise of judicial power, in the proper sense, in reviewing and correcting the illegal listing; and that it could not have been used in this case because this statute gives the right of review and correction in the circuit court by appeal; and that, in the general law on *certiorari* contained in the Code, the use of the writ is in such case denied. I am of opinion, therefore, that the act of the circuit court in reviewing the action of the county court in a case of illegal listing and assessment was judicial, and not simply *quasi* judicial; and that an administrative body, like the county court, should act upon such question in a *quasi* judicial manner, is no reason why a judge or court clothed with full judical power may not decide the same question on review, in a judicial manner, and according to judicial methods of procedure. See *Upshur Co.* v. *Rich*, 135 U. S. 474 (10 Sup. Ct. 551) and cases cited.

A writ of *certiorari* under our statute, prosecuted for the attainment of the parties' rights, must be a suit. *Weston* v. *City Council of Charleston* (1829) 2 Pet. 449, was a case of illegal taxation. On page 464, Chief Justice Marshall says: "The modes of proceeding may be various, but, if a right is litigated between parties in a court of justice, the proceeding by which the decision of the court is sought is a suit. The question between the parties is precisely the same as it would have been in a writ of replevin or in an action of trespass." So, in this case, the question decided on appeal to the circuit court was the legality of the listing of this oil lease for taxation in the land books; and the proceeding, in form and substance, the same as it would have been on writ of *certiorari* under our Code. See *Boom Co.* v. *Patterson*, 98 U. S. 403; *Delaware Co. Com'rs* v. *Diebold Safe & Lock Co.* 133 U. S. 473 (10 Sup. Ct. 399); *Kohl* v. *U. S.* 91 U. S. 367; *Gaines* v. *Fuentes*, 92 U. S. 10; *Ellis* v. *Davis*, 109 U. S. 485 (3 Sup. Ct. 327); *Hess* v. *Reynolds*, 113 U. S. 73 (5 Sup. Ct. 377.)

In the present case the county court, in reviewing the as-

sessment, exercised only *quasi* judicial power; but the appeal was had to the circuit court, a tribunal having power to determine questions of law and fact, either with or without a jury; and there were parties litigant who contested the case on the one side and on the other. In this class of cases, great stress is laid in some of the arguments on the fact that to impose taxes is legislative power, and that, by article V of the Constitution, the legislative, executive, and judicial departments shall be separate and distinct, so that neither shall exercise the powers properly belonging to either of the others; nor shall any person exercise the powers of more than one of them at the same time, except that justices of the peace shall be eligible to the legislature. This article was in the first Constitution, the one of 1776 (see section 3, 1 Rev. Code, p. 34); the Constitution of 1830 (see article 2, Supp. Rev. Code, p. 16), Constitution of 1851 (see article 2, Code 1849, Ed. 1860, p. 38); Constitution of 1863, first one of West Virginia (see article I, s. 4; Code 1868, p. 20); and the same as amended, and as it now exists (see Code 1891, p. 25). Each one of these instruments may be said to contain in itself a constitutional construction of this article, as an inference to be drawn from other expressed provisions, and it has received a continuous legislative construction, running through a period of more than one hundred years; and such long continued practical exposition is entitled to great weight and is a safe guide in interpretation.

The legislature must impose the tax, fix the rate and subject of taxation, the mode of assessment and collection. This it must do by general laws, but, in a proper case, it is as much the duty and as much within the judicial power of the courts to expound and apply these general laws as it is within the legislative power to make them. The right of appeal can only exist when given by the people in the organic law, or by legislative enactment; and to limit and withhold the right of appeal is the remedy for the delay complained of. The power of taxation is certainly a legislative prerogative, but it is essentially despotic in its nature, and therefore to be surrounded by all possible safe guards against harmful exercise, that the people or their legislature may see fit to devise. For a full collation of authorities and

discussion of the subject, see *Mayor, etc., of Baltimore* v. *State*, 15 Md. 376; 74 Am. Dec. 572, and note. See *Andrews* v. *Auditor*, 28 Gratt. 115.

The separation so long and so universally insisted upon in the organic laws of the several states was occasioned by Montesquieu's Spirit of Laws, first published in 1748 (see Book 2, c. 6) where he analyzes sovereignty into legislative, judicial, and executive power. Upon this he based his theory of political liberty; but he did not discover complete separation of these branches of sovereign power in the British Constitution. He best explained, if he did not discover, the essential principles of the English constitution. See Hunter, Rom. Law, p. 786. From the nature of the thing, we see plainly that the hard and fast line urged upon us can not be drawn, and was not intended to be drawn, between these three powers and functions of government. In that large and growing branch of the conduct of public affairs which may be called the "administrative" as distinguished from the "executive" and from the purely "ministerial," there is inherent in its nature a union of the *quasi* judicial function and the ministerial function; the two are inseparable.

If taxation is to be legal and uniform in its legality, and the Constitution in words requires that, also making it the duty of the owner to enter his land on the land books, there must be some tribunal of ultimate appeal in proper cases to determine the legality of assessment for taxation. Otherwise we would have (as at this point there is in this case) one part of the same right or thing held to be properly put on the land book of the county for taxation, and another part stricken off the land books of an adjoining county, as improperly put on for taxation; such want of uniformity brought about not at all in the exercise of discretionary power or difference of opinion in the estimate of values, but on difference of opinion as to the legality of the assessment for taxation. The urgency of the state to have her taxes can never be so great as to deny the right of having their legality brought to a proper test, in proper time and in some proper way. And these governmental functions are set apart for the purpose, among others, to keep each other

in check; and a check of that kind is nowhere needed more
than in the exercise of the power of taxation, which comes
home to all. The one branch of general law imposes taxa-
tion; the other, in a proper concrete case, passes upon the
legality of the tax imposed. Full and unrestricted play is
not, to such extent as claimed, allowed to the legislative
power in this matter, on the true interpretation and practi-
cal application of this clause of the organic law, creating
the subdivision, and requiring the separation in the exer-
cise of these three powers. It is a serious question, and one
of vital moment, for the courts instituted and invest-
ed with power by the people, in their organic law, to re-
nounce an important function under a misconception of the
true composite ancillary character of judicial power, prop-
er in concrete cases, under the notion that, being to some
extent administrative, it is ministerial, and being minister-
ial in part, it is executive, within the meaning of the Con-
stitution, and therefore something with which the judiciary
can have nothing to do. See 1 Ham. Bl. Comm. p. 222,
note. Whereas a contest can arise in actual cases involv-
ing the validity, the true meaning, and the proper applica-
tion and enforcement of such administrative laws, in a par-
ticular state of facts between parties, as well as under any
laws in general, and so long as the people see fit to make
the court, in that sense and to that extent and in that way,
the executive repository of the state's judgment, as a pre-
liminary to the enforcement in cases *inter partes* of the state's
will, the courts must exercise such function.

This brings us to the remaining question: Has this prop-
erty been legally listed and assessed on the land books of
Marion county, for the purposes of taxation? It has long
been the practice of this state and of the state of Virginia,
in matters relating to taxation, to keep personal property
and real estate property separate and distinct, listing and
assessing the one kind in a book called the "Personal Prop-
erty Book," and the other in the "Land Book"; and some
of the reasons, based on convenience, for this mode of as-
sessment, are as follows: Personal property is movable, per-
ishable, evanescent, and fluctuating in value from year to
year, and therefore the assessor not only lists it every year

as a subject of taxation, but reassesses its value. But real property, owing to its technical character, under the common-law, is not only immovable, but is also imperishable; and it has been thought best not to reassess its value every year, but only once in about every ten years. Hence the assessor has nothing to do with changing the assessed value of real estate, for it has been found by long experience to be one of the most difficult problems in fiscal affairs to keep such taxation equal and uniform thoughout the state, even with a fairly approximate degree of accuracy, with all the appliances of boards of equalization and like tribunals established for the purpose. The legislature therefore determines when the land or lands or real estate or real property shall be reassessed by special act, and, as stated above, this is done about once in every ten years.

What, then, is the subject-matter of the special act of reassessment of 1891, and does the property (these oil leases) belong to such subject-matter, within the meaning of the act? We may expect to find the object—the main general purpose—of the act expressed in the title, for the Constitution so requires. See Code Ed. 1891, p. 30, art. VI, s. 30. The title is "An act to provide for the reassessment of the value of all real estate within this state." By a statutory rule of construction, the word "land" or "lands" and the words "real estate" or "real property" include land, tenements, and hereditaments, and all rights thereto and interests therein, except chattel interests, unless a different intent on the part of the legislature be apparent from the context. See Code, c. 13, s. 17, par. 15. In the assessment law, the term "property" is used, not in the sense of the right of ownership, but of the thing owned, which is listed for taxation opposite the name of the owner. The context shows that "oil and gas underlying the surface, and within the location of the land, shall be considered in ascertaining the value of such land in current money"; and, when oil or gas privileges or interests are held by a party exclusive of the surface, the same shall be assessed separately to such parties—the land to the one, the oil privilege or interest to the other. The manifest object of this assessment of the parts held by divided ownership

is to ascertain the values of the parts, so that the proper amount of tax due on each part may be definitely ascertained, if there is a divided ownership. It is not claimed on behalf of the appellant, the South Penn Oil Company, that the leases, or rather the privileges and interest thereby granted, are not "property," within the meaning of the constitution (article VIII) and subject to taxation, but that (1) it is assessed, or should only be assessed, in the name of the person who, by himself or his tenant, has the freehold in his possession, whether in fee or for life, for section 40 of chapter 29 of the Code provides that as to real property such person, owner of the freehold, shall be deemed the owner for the purposes of taxation; or (2) being but a chattel interest, it should not be listed on the land book, but on the personal property book, if at all.

The first point made on behalf of the oil company leads to some consideration of the policy of the state in requiring the land to be charged on the land books for taxation in the name of the person who has the freehold in possession; and "possession," as used in the assessment law, does not mean a visible or actual possession of the land itself, but a vested ownership of freehold quantity. As the land (the thing owned) lasts forever, and the ownership must be as lasting, the owner, by himself and his heirs, as a kind of corporation, is regarded as living forever; for the quantity of ownership is measured by time. The freehold in possession is the first part of such ownership, and the rest of it, for all time, is in the remainder-man and his heirs. But, for purposes of taxation, the law ascertained the value of the land itself, and required the one having the freehold in possession, in the sense of a vested right, to pay the whole taxes, without stopping to ascertain the quantities of ownership that each owner might have, vested or contingent, or the respective values of such parts of the divided ownership; for the ownership applied to the whole corpus of the land; their respective quantities were measured by successive periods of time; the ownership was thus parted and measured, and not otherwise, having no reference to the corpus so parted as to ownership, as to give, for example, one a fee in the coal, and to the other the rest of the land

as the thing owned. Now, in cases of divided ownership in the latter sense, the policy of the law is to make a divided assessment and valuation for the purpose of separate taxation, as indicated clearly by the present act and other laws on the subject. In the case of *United States Coal, Iron & Manufacturing Co.* v. *Randolph Co. Ct.*, 38 W. Va., 201 (18 S. E. 566) this latter mode of assessment, and under this same act, came under consideration in a case like this. It was held proper for the commissioner of reassessment to assess separately to the respective owners the surface and the minerals, where they were separately held, in the sense of being separately owned. It was in that case a coal lease of certain lands, giving the right to enter upon the land to bore and explore for the veins of coal and mine for such term of years as should be required to mine and remove all merchantable and marketable coal, the lessee to pay ten cents per ton. It was regarded that the lease had come to an end, and therefore should not be separately assessed for taxation. The court took the view, in construing the statute, that the word "held" meant "owned," in the sense of at least freehold ownership; that the party to be separately assessed must own the mineral privilege or interest, if not in fee, at least to the extent of a freehold; that a mere lessee for years, paying royalty or rent in kind, has a chattel interest; but that the entire ownership of the whole corpus remains undivided in the lessor. A lessee, in the proper sense, may, by contract, have the right to the possession, and the possession, of the coal, as a part of the thing to which the ownership applies, but no part of the ownership of the thing owned is vested in him; and the statute contemplates a case in which the other party has become the owner of the mineral or coal and "holds" it as such owner. And in that common-law sense, adopted by the general assessment law, the ownership to be assessed can not be divided into parts less in quantity than a freehold. Co. Litt. § 57; Williams, Real Prop. top page 23.

By the leases here in question, the owner does not agree to part with any part of his ownership in the oil *in situ*, or in any part of the thing or corpus to which his ownership applies, but contracts, by words of grant and demise, that

the lessee shall have the exclusive right to mine, bore, and explore for, excavate, and produce, oil, *etc.*, if it can be found within the time fixed; and, if found, then to have and to hold the land demised for boring, *etc.*, for the term of five or ten years, or as long as oil and gas may be found in paying quantities, paying the lessor a royalty of one-eighth. The right of the lessee or grantee under its provisions was to explore for and determine the existence of oil or gas under the lands. If none was found, the rights of the grantee ceased when the exploration was finished. If oil or gas was found in paying quantities, then the contract took effect as an oil lease, and the lessee has a right, under a contract obligation, to operate the land for the production of oil, during the time and upon the terms fixed in the lease. See *Oil Co.* v. *Fretts,* 152 Pa. St. 451, 456 (25 Atl. 732). The privilege or right to hunt or explore for oil does not profess to be in fee or for life, and vests nothing but the right, for a limited period, to work the land for oil. By it, the parties acquired no estate, either in land or minerals. If they had found oil, they were to have seven-eighths of that which they brought to the surface, or produced; but as to property or ownership in the oil *in situ* they had none. See *Funk* v. *Haldeman,* 53 Pa. St. 229; Thompson's Appeal, 101 Pa. St. 225, 232; *Rynd* v. *Oil Co.,* 63 Pa. St. 397; *Duffield* v. *Hue,* 129 Pa. St. 94 (18 Atl. 566); *Brown* v. *Beecher,* 120 Pa. St. 590 (15 Atl. 608); *Duke* v. *Hague,* 107 Pa. St. 57; *Horner* v. *Leeds,* 25 N. J. Law, 106; 2 Shars. & B. Lead. Cas. Real Prop. 30. Nor does the addition to the term of years of the clause "and as long as oil or gas may be found in paying quantities" give it such indefinite duration as makes the interest freehold in quantity; for, after the expiration of the term prescribed (ten years), the lessee, having the option to continue to pump if he can find oil in paying quantities, becomes a tenant at will, which may become a tenancy from year to year on the terms of the lease, but is not a freehold, because its extension after the end of the term prescribed depends upon his own act, the exercise of his own will; so, according to the terms of the instrument, that is as large an interest as the words will bear. Such superadded possibility of extended duration constitutes no part

of the term of years prescribed, but is a new interest, in the nature of an option to become tenant at will or from year to year, by the exercise of his own volition when the fixed term of years shall have expired. He has but a contract with the owner of the land for the possession. He is not seised of any part of the ownership of the land by any title. See 2 Bl. Comm. 140, by Hammond, and Editor's notes, p. 254. This lease, so far as the seisin of the ownership of any strata or part of the corpus of the land is concerned, neither creates nor transfers such ownership, or any part thereof, which can not be created or transferred in less quantity than that of a freehold.

Thus far we have endeavored to show that the true interpretation of the act for the reassessment of real estate does not contemplate or require separate assessment of minerals from the land, except where separate freehold interests are held or owned, for the purpose is not to increase the value of the land, and thereby increase the taxes, but to divide the taxation, where there is divided ownership; so that each owner may be assessed, held liable, and proceeded against directly by the state for his part, and no more; and that his land shall not be returned delinquent for taxes, and sold for a tax on the coal or oil which another man owns. But it is said, concede these mineral privileges and interests to be personal property, the law requires all property to be taxed in proportion to its value by an equal and uniform tax, and the book in which it is listed is a matter of no importance. The answer is that, if the land is assessed at its true value, the minerals *in situ* are already assessed and taxed as an undivided part thereof.

We now propose to show that it is a matter of great importance that no interest in minerals less than the freehold interest should be listed and assessed on the land books, and that such confusion would lead to consequences which ought to be carefully avoided. Ever since 1776 (more than one hundred years) the separate classification and listing in separate books of real estate and personal property has been observed, and for the obvious reason, among others, that the methods of collecting the tax and enforcing the payment are in the two cases different. If it is real estate,

the tax is a lien thereon, and this lien may be enforced by suit in equity in the name of the state (see Code 1891, c. 31, s. 1); or the sheriff may sell for taxes (see chapter 31) as delinquent; or, if bought in for the state, they are, if not redeemed within a year, treated as forfeited, and proceeded against as such. The trouble, confusion, and insecurity of titles.brought about by the sheriff's sales of delinquent lands for taxes would be greatly increased, and to some extent introduced into sections of the state now comparatively free from it. If the state sees fit to tax this kind of personal property, then it can be distrained and sold like other personal property. See chapter 30, s. 7 *et seq.*

The two kinds of property are required to be listed in two different books: (1) Because in this state they differ in their nature. (2) Article XIII of the Constitution applies to land alone, and not at all to any personal property or chattel real. (3) Chapter 13, s. 17, of the Code, says that the word "land" or "lands" and the words "real estate" shall include lands, tenements, and hereditaments, and all rights thereto and interests therein, except chattel interests; and the words "personal estate" or "personal property" include goods, chattels, real and personal, money, credits, investments, and the evidences thereof. (4) Land shall be listed in the land book. See chapter 29, ss. 1-13a, inclusive. In section 37 it requires the listing in the name of the person who has the freehold in his possession, giving the nature of his estate, whether in fee or for life. What would the assessor say about these leases—that they were in fee or for life? Section 46 reads: "The words 'personal property,' as used in this chapter, shall include all fixtures attached to the land, if not included in the valuation of such land entered in the proper land book; and all things of value, movable and tangible, which are the subjects of ownership." Section 48 prescribes expressly that all personal property shall be entered in the personal property book. (5) The one goes to the heir, the other to the personal representative, for purposes of taxation, as well as for other purposes. So that the law does deem it important that the two kinds of property shall be kept and listed separate and distinct from each other, throughout the whole

procedure for assessing and collecting taxes. Owing to the peculiar nature of land, and the fact that it is the *locus standi* of the state, without which it can not exist, the state can not but be in some sense the lord paramount, and has and constantly exercises the right of eminent domain, as well as the power of taxation, so that the owner of land is brought into peculiar touch, and stands in peculiar relations, with and to the state; and as long as the state has by her organic law, as well as by her general statutes, framed her whole legal machinery for dealing with land as one thing, and goods and chattels as another, for many purposes, including that of taxation, it will not do to confuse and confound such distinction, lying at the very foundation of her scheme and method of taxation, and her laws throughout are framed on that distinction, and show in this law, as well as in all others, from the organic law down to this one, that such distinction shall be recognized and observed. Thus, we see that it does make a difference in which book land or personal property shall be assessed. When there is a sale or conveyance of the ownership of a part of the real thing owned, or of a freehold interest in the ownership of such part, whether it be the standing timber above, or the oil or coal or other mineral below, or an incorporeal freehold right or privilege or irrevocable and exclusive license to enter, explore, and hunt for the same, and, when found, sever and carry them away to the grantee's use, such freehold ownership, privileges, and interests should be assessed separately on the land books. See *Manufacturing Co.* v. *Gilford*, 64 N. H. 337 (10 Atl. 849).

A legal assessment for taxation lies at the foundation of the whole proceeding; for, where the assessment is illegal, the tax is invalid, because unlawful; and the decision by the circuit court of a controversy in a case between parties litigating the legality of such assessment was made in the exercise of judicial power in the proper sense, and was a judicial act, as contradistinguished from the *quasi* judicial act of the county court brought up on appeal for review, so far as it involved the legality of the tax, no matter that it also comprehends a review of the estimate of values as an appellate administrative tribunal.

The Constitution has established a court of last resort with two main objects in view: (1) To gratify, as far as the public policy of general convenience will permit, the desire of appeal and review—one of the strongest feelings of English-speaking people, and, as they think, one of the safeguards of rights. He bows with cheerful submission to the mandate of the law only after he has had the opportunity of testing it in the court of last resort. (2) To establish, to some practical extent, uniformity in the administration of justice, and in the interpretation and application of the laws. It is desirable to have taxation equal and uniform throughout the state, not simply uniform valuation of things of the same value, but uniform listing of things of the same kind for purposes of taxation, and not have one part of an oil lease listed for taxation in the county of Marion, and the other part stricken off the land books of the adjoining county of Wetzel, to remain without remedy, and with no power to produce uniformity by bringing the legality and validity of such diverse action to the test of some one binding ultimate decision of some tribunal of last resort, such as the Constitution has provided. How is the legislative will to be executed as one uniform rule of conduct, speaking with one and the same voice of command, in every county, unless the executive power of the state can, in concrete cases of controversy between parties, have the aid of some power whose proper function it is to declare and apply the law in determination of such controversy? Such function is the exercise of judicial power in the strictest sense, and, if that be so, then the organic law in this case gives the jurisdiction.

The state can not be made a party defendant in any of her courts, either of law or of equity; but here she has made herself a party plaintiff, for the purpose, expressly mentioned, among others, of determining speedily whether there is any error committed in the listing and assessment complained of; and the mode of legal proceeding she has prescribed is in every particular the same as a writ of *certiorari* to rehear and review, as amended and enlarged by our statute, a method of judicial procedure, in the exercise of judicial power proper, and the fact that it also brings

up for review by the circuit court, as an appellate administrative tribunal, the question of ascertaining and fixing value, does not make, and was not intended to make, the judgment of that court on the question of the legality of the listing and assessing for taxation also the exercise of *quasi* judicial power, but it was intended to be, and from its nature was, the exercise of judicial power in the proper sense. And because the matter here involved in controversy is, exclusive of costs, of greater value and amount than one hundred dollars, an appeal lies to this Court, if not also upon another ground that need not now be considered.

Therefore, in my view, the action of the county court of Marion was right, and the judgment of the circuit court complained of was erroneous, and must be reversed.

## On Rehearing.

I have found no ground for changing the foregoing opinion, handed down at the fall term, 1894. See the case of *Kanawha Co. Ct. v. Charleston & S. S. Bridge Co.*, 41 W. Va. 658 (24 S. E. 1002); decided at this term.

Dent, Judge, (concurring):

In accordance with my opinion in the case of *State v. Charleston & S. S. Bridge Co.*, 41 W. Va. 658 (24 S. E. 1002) decided at this term of court, and for reasons therein stated, I have reached the conclusion that the circuit court, in hearing appeals in tax assessment cases, necessarily acts in a dual capacity, to wit: (1) As a mere assessor representative of the legislative branch of the state government, in the ascertainment of assessable valuations for the purposes of taxation; (2) as a court representative of the judicial branch of the state government in the determination of the constitutional and statutory right of taxation. In cases coming under the first division solely, this Court is without jurisdiction; but, as to cases coming under the second divison, this Court has appellate jurisdiction, by means of writ of error.