# CHARLESTON.

## J. T. MUSGRAVE *v.* S. C. MUSGRAVE *et al.*

Submitted March 16, 1920.   Decided April 13, 1920.

WILLS—*Devisee of Subdivision of Leased Land Entitled to Rents and Royalties from His Subdivision.*

Where the owner of a tract of land leases the same for oil and gas development, and dies before any operations are conducted thereon under such lease, leaving a will by which he divides said tract of land into several parcels, and devises to each of his children one of such parcels, and the lessee in such oil and gas lease subsequently produces oil or gas from some of such subdivisions, the present owner of each of the subdivisions from which such oil or gas is produced will be entitled to receive the rents and royalties arising from the production from the sub-division owned by him.

(WILLIAMS and POFFENBARGER, JUDGES, dissenting.)

Appeal from Circuit Court, Monongalia County.

Suit by J. T. Musgrave against S. C. Musgrave and others for an accounting for royalties produced from oil and gas wells and for a division thereof among all the heirs at law of John J. Musgrave, deceased.   Demurrer to bill sustained, and plaintiff appeals.

*Affirmed.*

*L. C. Musgrave* and *William T. George,* for appellant.

*Glasscock & Glasscock, Cox & Baker, A. B. Fleming, Chas. Powell* and *Kemble White,* for appellees.

RITZ, JUDGE:

On the 7th of March, 1902, John J. Musgrave, being the owner of a tract of about 335 acres of land, executed an oil and gas lease thereon for the term of ten years from its date, and as long thereafter as oil and gas, or either of them, is produced therefrom, and providing further for the delivery of a certain stipulated proportion of the production to the owner of the land as consideration for the lease.   In 1895 he made his will devising this land to his several children.   By the terms of the will it was cut up into several different tracts, one of which was de-

vised to each of the children. In December, 1903, he departed this life. His will was duly probated, and his children took the parcels of land devised to them by the terms thereof. Up to this time there had been no development for oil or gas upon the tract of land. Sometime after the death of Musgrave the holder of the lease began development upon one of the subdivisions. The well proved to be a producer, and subsequently several other producing wells were drilled on some of the tracts of land. Upon the part of the farm devised to the plaintiff under the will of his father no development was had. He demanded of the lessee that the royalty derived from the wells drilled upon the whole tract of land be divided among all of the heirs of John J. Musgrave, which demand was resisted by the parties upon whose tracts the wells were located, and denied by the lessee. This suit was thereupon brought by J. T. Musgrave, one of the children of John J. Musgrave, against the other heirs at law and the lessee in the oil and gas lease, to compel an accounting for the royalties produced from the wells upon said land, and a division thereof among all of the heirs at law of John J. Musgrave. From the decree of the circuit court of Monogalia county sustaining a demurrer to the bill, this appeal is prosecuted by the plaintiff.

It will be observed from the above statement that the sole question presented here is, whether the plaintiff is entitled to participate in the distribution of royalties arising from wells drilled upon a parcel of land other than the one devised to him, because of the fact that the lease under which the well is drilled was executed before the land was divided, and included the whole tract. The question was before this court in the cases of *Campbell* v. *Lynch,* 81 W. Va. 374, and *Pittsburg & West Virginia Gas Co.* v. *Ankrom,* 83 W. Va. 81, 97 S. E. 593. In the former case it was held that where the owner of a large tract of land leased it for oil and gas development, and died before any work was done under the lease, and his heirs at law partitioned the land among them, the result of any development thereafter upon the land inured to the benefit of all of the heirs, regardless of the ownership of the subdivision from which the oil or gas was produced. That decision was by a divided court, and subsequently, when practically the same question was presented in the case of *Pittsburg & West Virginia Gas Company* v. *Ankrom, supra,* it

was held, likewise by a divided court, that the oil produced belonged to the owner of the tract of land upon which the well was located. In that case a bankrupt owned a large tract of land on which existed a valid oil and gas lease. His trustee in bankruptcy cut this up into a number of small tracts and sold them without regard to the oil and gas lease subsisting thereon. Thereafter production was had on some of the subdivisions, and it was claimed by the owners of subdivisions upon which no production was had that they were entitled to participate in the royalties, but it was held that such was not the case; that the owners of the subdivisions upon which the oil was produced were entitled to all of the royalties. The arguments in favor of the respective positions are fully developed in the opinions and dissenting opinions in these two cases.

The contention is made that when the land was divided at the death of Musgrave, in accordance with the provisions of his will, this did not effect a division of the oil and gas, but that this estate was still held in common, notwithstanding the provisions of the will and the devise of respective parcels of the land to the several children. If this contention is sustained, then at the time of Musgrave's death he owned two estates in the same parcel of realty, to-wit, the land itself, and another estate termed the royalty thereon, which according to all the authorities with which we are familiar cannot exist. As argued in the opinion in the case of *Pittsburg & West Virginia Gas Co.* v. *Ankrom, supra,* a party cannot have two different estates in the same land. As soon as two outstanding estates in the same tract of land become vested in one owner, the lesser estate becomes merged in the greater. We think the determination of this case depends upon the answer to the question, what did John J. Musgrave own at the time of his death? He was the owner of the whole 335 acres of land, subject only to the right of the lessee in the oil and gas lease to develop the same for oil. It has been repeatedly held by this court that the holder of an oil and gas lease has no vested estate in the oil and gas in place until development has been had upon the land, and oil and gas produced. At his death each of his children took every interest in the parcel of land assigned to him respectively that John J. Musgrave had therein. It cannot be doubted that he, John J. Musgrave,

was the owner of the oil and gas underlying this tract of land
at the time of his death. The lessee had not developed. No
oil or gas had been found at that time, and the only interest that
the lessee had in the property was a mere right to go upon it
and prospect for oil and gas. The oil and gas underlying the
property were owned absolutely by John J. Musgrave. When
he devised a particular parcel of this land to one of his children,
that one took in that parcel of land all of the interest that John'
J. Musgrave had therein, including the oil and gas, and all other
minerals underlying it. That oil and gas are minerals and be-
long to the owner of the land cannot be denied. They are the
property of him upon whose land they are produced. It is true
that it is generally believed, and it may be conceded, that these
minerals are more or less vagrant in their character. They do
not persist in the same position in the earth at all times, but the
owner of land has the right to develop the same for the purpose
of producing oil and gas, and if in the course of this develop-
ment oil or gas from adjacent lands escapes to his premises it
belongs to him; and vice versa, if oil or gas which at one time
underlay his land escapes and is produced through wells on ad-
joining lands, it belongs to the proprietor of such land. This
is the conclusion reached by the majority of the court in the
case of *Pittsburg & West Virginia Gas Co.* v. *Ankrom, supra,*
and after careful consideration we adhere to that conclusion. It
would serve no useful purpose to further elaborate the argu-
ments in support of this contention as they are fully stated in
the Ankrom case, and our attention is not called to any further
or other reason in justification or condemnation of the con-
clusion there reached. As shown by the opinion in that case,
the conclusion is supported by the decisions of the Supreme
Court of Ohio in the case of *Northwestern Ohio Natural Gas
Co.* v. *Ullery,* 68 Ohio St. 259, 67 N. E. 494; the Supreme Court
of the State of Arkansas, in the case of *Osborn* v. *Arkansas Ter-
ritorial Oil & Gas Co.,* 103 Ark. 175, 146 S. W. 122; by the Ap-
pellate Court of the State of Indiana, in the case of *Fairbanks*
v. *Warrum,* 56 Ind. App. 337, 104 N. E. 983. Those cases are
reviewed in the opinion in the Ankrom case, and we consider
it unnecessary to do more than cite them at this time.

Since the decision in that case, the Supreme Court of Oklahoma has had before it this identical question, and in the cases of *Kimbley* v. *Luckey,* 179 Pac. 928, and *Pierce Oil Corporation* v. *Schacht,* 181 Pac. 731, that court followed the decision of this court in the Ankrom case, supported by the authorities there cited. It is true the Supreme Court of Pennsylvania has taken the contrary view in the case of *Wettengel* v. *Gormley,* 160 Pa. St. 559 and 184 Pa. St. 354. We could not agree with the conclusion reached by that court at the time of the decision of the Ankron case, and after a further careful review of the arguments advanced to support it we are still of the opinion that the same is unsound.

Finding no error in the decree complained of, the same is affirmed.

MILLER, JUDGE, (concurring) :

I fully concur in the opinion of the court in this case as prepared by Judge RITZ, and in the principles on which it is founded as more fully elaborated in the prior opinions of the court to which he there refers. The dissenting opinion as prepared by Judge POFFENBARGER, it seems to me, is a labored effort in support of the two theories upon which his opinion in *Campbell* v. *Lynch* was predicated; namely, (1) that by the execution of an oil and gas lease, the lessor thereby raises or creates in himself a separate and distinct estate or entity called a royalty, which he denominates or characterizes an incorporeal hereditament; (2) that royalty is rent, or an issue out of land like rent, and is governed by the same principles applicable to rent service. The purpose and object of maintaining these two theories is manifestly to support his contention that the oil in place, burdened with the lease previously executed, did not go to the devisees under the will, although it is conceded that the title to the land did go to them; and, secondly, that the royalty thus reserved out of the oil is rent, and the land being burdened with the lease at the time the device took effect, must necessarily be apportioned among the devisees as rent issuing out of the land would go in such cases. These two theories are wholly inconsistent. If we accept the one, the other is destroyed, for it is demonstrated by

the dissenting opinion that rent can only issue out of land, and not out of an incorporeal hereditament as this separate entity characterized as royalty is said to be.

In undertaking to maintain these two inconsistent theories the dissenting opinion, it seems to me, is its own best refutation.

*Affirmed.*

POFFENBARGER, JUDGE, (dissenting) :

Regarding the principle applied in *Campbell* v. *Lynch,* 81 W. Va. 374, as having been finally approved, adopted and settled, as law in this state, I did not reply to the arguments against our conclusion, set forth in the dissenting opinion, by an extension of, or supplement to, the majority opinion. Indeed, the conclusion, in my opinion, stood so firmly upon reason and authority and seemed to be so clearly incontestable, that I did not anticipate nor expect the numerous assaults made upon it from different sources, nor any change in the attitude of this court, respecting it. By way of dissent from the opposite conclusion arrived at in *Pittsburgh etc. Co.* v. *Ankrom,* 97 S. E. 593, I relied upon my opinion in *Campbell* v. *Lynch* and refrained from replication to the arguments and contentions set forth in support of the majority view, because I did not see anything in it, indicative of a change of attitude, since Judge LYNCH was represented as entertaining the view that the case was distinguishable in its facts from *Campbell* v. *Lynch.* I am not disposed now. however, to let the decision in the case last named be overruled, without a protest and a full disclosure of what I conceive to be fallacies and invocations of inapplicable principles, found in the dissenting opinion, in *Campbell* v. *Lynch,* the majority opinion in *Pittsburgh etc. Co.* v. *Ankrom,* and two cases recently decided in Oklahoma.

Judge RITZ' opinions filed here in these several causes and the opinion delivered in *Kimbley* v. *Luckey,* (Okl.), 179 Pac. 928, proceed upon the theory that the right of exploration and severance after discovery of oil or gas, vested by the lease, virtually amounts to nothing, until after discovery and severance. That theory is contrary to many express decisions. Indeed, I know of no instance, except those mentioned above, in which it has ever been recognized, countenanced or applied. This court has

decided exactly the contrary in cases too numerous to mention. That right has been the subject matter of many stubborn controversies settled by adjudication here. In every case in which there has been an effort to get rid of a lease by forfeiture or cancellation, in advance of discovery and production, it has been involved. *Steelsmith* v. *Gartlan*, 45 W. Va. 27; *Bettman* v. *Harness*, 42 W. Va. 433; *Wilson* v. *Reserve Gas Co.*, 78 W. Va. 329; *Johnson* v. *Armstrong*, 81 W. Va. 399.

Our decisions conclusively affirm that, on the discovery and production of oil or gas, the rights of the parties, in substantial respects, go back by relation, to the date of the lease. They say the status of the oil and gas and rights respecting them, are fixed and determined as of the date of the lease. In *Koen* v. *Bartlett*, 41 W. Va. 559, an owner of land, after having given an oil and gas lease on it, conveyed it in separate parcels to his six children, reserving an estate in the entire tract for his own life. He had previously conveyed away one-half of his royalty. This all occurred before discovery or production of oil. Not quite a year after the date of his deeds to his children, he conveyed to strangers the other half of the royalty. The plaintiffs in the case claimed the latter half by purchase from the children and the defendants by purchase from the father. This court held that the defendants were entitled to it, as assignees of the life tenant, saying "A mine lawfully leased to be opened is an 'open mine'." Although not opened at the date of the lease, nor at the dates of the conveyances to the children, it was treated as if it had been opened before the life estate began, because, and only because the lease had conferred upon the lessee right and power to open it. The royalty was the only thing in issue and right to it, as a thing legally separate and distinct from the land and the freehold estate, was determined as of the date of the lease, a date prior to those of discovery and production. This decision was referred to with approval in *Williamson* v. *Jones*, 43 W. Va. 562. It was followed in *Alderson* v. *Alderson*, 46 W. Va. 242, involving the claim of a life tenant to royalties arising from a lease of coal, made before the life estate began, and under which mines were opened after it began. Notwithstanding these decisions, it is now intimated, if not asserted, that a mining lease confers only rights of exploration and production

and amounts to nothing until after production has actually taken place.

These decisions directly answer and refute the contention that there can be no such thing as a separate entity called a rent or a royalty, while the lessor owns both it and the land out of which it arises. In *Koen* v. *Bartlett,* Kerns created a potential royalty. Then he conveyed the land in fee simple to his children, reserving to himself a life estate. The royalty was not mentioned in the deeds to the children. Although the oil was "adhering to and becoming part of the land" in the language of the Ohio court, seized upon with avidity here and in Indiana, Arkansas and Oklahoma, his conveyances of the fee simple title to his children did not carry the royalty. About the time oil was discovered, he executed a deed conveying half the royalty to Bartlett and Brand and they got it. If it was not a separate or separable thing and was by law immovably and unalterably fixed and annexed to the fee, how did he retain it after the date of his deeds to his children and then pass it over to strangers? How could the coal royalty created by the lease made by Mary Alderson survive her and go to her husband, life tenant by his courtesy, if it was not distinct from the fee, while she held it. Legally, it was the same as the income from an open mine, before she died, although the mine was not opened until after her death. In common parlance, royalty has a two-fold meaning. In some connections it means coal, oil, gas or money produced and delivered or deliverable to the lessor. In others, it means the right to have the coal, oil, gas or money. Its distinct and separate character in the latter and legal sense, has been recognized by this court in cases holding it to be a subject of compulsory partition. *Smith* v. *Linden Oil Co.,* 69 W. Va. 57; *Peterson* v. *Hall,* 57 W. Va. 535, overruling *Zinn* v. *Zinn,* 54 W. Va. 490, denying it such status.

If a royalty is not a separate entity, how can its owner assign or convey it? Nobody, so far as I am aware, has yet denied that its owner can validly dispose of it, or that such royalties are bought and sold daily. How could an owner of land convey or otherwise dispose of an oil royalty out of it, without having first created it by a lease for oil purposes? If a royalty so created and not disposed of by the owner, were claimed and withheld by

another party, as having been obtained, when, in law and fact
its owner had not parted with it, what would the remedy be?
Ejectment or unlawful detainer? Neither of these remedies
might be available, if appropriate, because the lessor and lessee
might both be in possession of the land and the claimant of the
royalty not in possession of it at all. Would it be a bill in equity
to remove cloud from the title? How could that be done? To
cancel the lease, if possible, would destroy the royalty, not ac-
quire it. It would put an end to the very thing the plaintiff
would be endeavoring to obtain by a decree. Under this ruling
made in a few words, without any effort to demonstrate its cor-
rectness, and wiping out at one fell swoop all of the holdings of
this and all other courts in oil producing states, that oil and gas
royalties are virtually rents and should be treated as rents, a les-
sor suing the lessee for his royalties, need not take any notice of
the lease or its covenant to pay the royalty, in his pleadings.
As the royalty is incapable of existence and cannot be owned
separately from the land or be separated from it, while he owns
both, he could do no more than allege and prove his title to the
land and the actual severance of the oil or gas, or both, by the
defendant; and the court would have to allow him the limit of
his demand, provided it did not exceed the value of all the min-
eral taken out. The old way was to sue on the covenant in the
lease, creating an obligation to pay royalty and defining the
rights of the parties. Royalties of all kinds are treated as rents
and sued for, when necessary, as other rents of similar kinds.
*South Penn Oil Co.* v. *Snodgrass,* 71 W. Va. 438; *McGraw Oil
Co.* v. *Kennedy,* 65 W. Va. 595; *Toothman* v. *Courtney,* 62 W.
Va. 167; *Lawson* v. *Williamson Coal Co.,* 61 W. Va. 669; *Aye* v.
*Philadelphia Co.,* 193 Pa. St. 451; *Ray* v. *Gas Co.,* 138 Pa. St.
576; *Kissick* v. *Bolton,* 134 Ia. 605.

I have never classed an oil royalty as a rent in the technical
sense of the term. It may not be. The right given by the lease
to sever and take away the oil may be technically a license, or a
*profit a prendre.* Suppose it is. It is nevertheless an incor-
poreal right arising or issuing out of the land, just as a rent is
an incorporeal right issuing out of land. Hence, in point of
general nature, they are alike, and therefore, at least analogous.
That is all that has been claimed or asserted thus far. If a

rent is not a legal entity separate and distinct from the land out of which it issues, for many purposes, all lawyers, judges and writers who have dealt with the subject, including Blackstone, have been wrong. Blackstone says "Rents are the last species of incorporeal hereditaments." Bk. 2 p. 41. He also says "An incorporeal hereditament is a right issuing out of a thing corporate (whether real or personal) or concerning, or annexed to, or exercisable within, the same. It is not the thing corporate itself, which may consist in lands, houses, jewels, or the like; but something collateral thereto, as a rent issuing out of those lands or houses, or an office relating to those jewels.  *   *   *   * Their existence is merely an idea and abstracted contemplation; though their effects and profits may be frequently objects of our bodily senses. And indeed, if we would fix a clear notion of an incorporeal hereditament, we must be careful not to confound together the profits produced, and the thing, or hereditament, which produces them." The right given the lessee to sever and take away the oil is also an incorporeal hereditament. Thornton Oil & Gas, secs. 52, 64 & 67. By every such lease, two such hereditaments are created, one vested in the lessee and the other in the lessor, and both are legally distinct from the land and oil and gas in place. It is possible that, in addition to the incorporeal right vested in the lessee to take out the minerals and another such right to demand and obtain the royalty, vested in the lessor, the lease creates an estate for years in the lessee, for it gives the lessee the use of the surface for mining purposes, to such an extent as is necessary or as is contracted for. With these academic questions, we are not concerned, however. The only thing I am combating, at this stage of the discussion, is the assertion that an oil royalty is not a legal entity distinct from the land and its title. It is a right to a share of the oil taken from the land, not the oil when produced, which is only the product or fruit of the right. A right to rent, whether it be a rent-service, with right of distraint, in the absence of a contract giving it, and payable partly or all in services, a rent-charge to which the right of distraint is not legally incident, but is made so by contract, or a rent-seck to which distraint does not pertain at all, is an incorporeal hereditament, a substantial right capable of passing by inheritance.

Tithes, though payable in corn, grass, hops, wood, milk, pigs, and the like, as well as in money, are such rights.  Blk. Com. 2 p. 25.

Of course, the royalty is related to the land and the mineral. Every incorporeal thing must be based upon or grow out of a material subject or body.  But, as Blackstone says, the incorporeal right and the material subject out of which it grows, or within which it is exercisable, are not one and the same thing, nor is ownership of the incorporeal right merged in the ownership of the subject as contradistinguished from a right growing out of the subject.  If a man having the right to mine, fish, hunt or pasture his stock on another's land, becomes the owner of the land, there is a merger of course.  But, if a man owning land, has a right to rent or other compensation for its use by some other person, there is no merger.  To hold that there is a merger in such case, would make the existence of the collateral right impossible.  There could be no such thing as a right to rent accruing from the use of land to the owner of the land. While the rent or royalty, grows out of the land, it is a right collateral to the land, created by contract, and, in the absence of a severance, attendant upon the ownership of the land.  It is a collateral, legal right owned ordinarily by the owner of the land.  It is not part of his title to the land, or of his estate in the land, and is not an estate in the land.  His ownership of the incorporeal rights is an estate in that right, not in the land in which he has another and different estate.  The owner has in the land, what is called an estate in reversion, and it may be after an estate for life, years or at will.  Blk. Com. Bk. 2, p. 176.  "And hence the usual incidents to reversions are said to be fealty and rent.  *  *  *  Where rent is reserved, it is also incident, though not inseparably so, to the reversion.  The rent may be granted away, reserving the reversion; and the reversion may be granted away, reserving the rent, by *special* words; but by a *general* grant of the reversion, the rent will pass with it as incident thereto; though by the grant of the rent generally, the reversion will not pass.  The incident passes by the grant of the principlal, but not *e converso*."  Blk.  Com. Bk. 2, p. 176. This is precisely the manner in which oil royalties and lands out of which they issue are handled daily all over this country and

yet a majority of this court, in the face of this common experience and in the face of this text from the greatest law book ever written, solemnly affirm that an oil royalty is not a distinct legal entity and that the owner of the minerals, the reversioner, cannot own it separately from the land.

In an effort to sustain the attempt to do away with the legal existence of the royalty by the manifestly inapplicable doctrine of merger or otherwise, the holding in *Toothman* v. *Courtney,* 62 W. Va. 167, to the effect that a grant or reservation of the royalties for all time to come carries title to the oil in place, is invoked.     That is a perfectly sound proposition.     The deed involved in *Updegraff* v. *Blue Creek C. & L. Co.,* 74 W. Va. 316, was construed, improperly as I think, as reserving all future royalties, not merely the royalty to accrue from the lease then on the land.     Nobody, so far as I am advised, has ever claimed a grant or reservation of the royalty provided by a particular lease, limited in time, amounts to or implies a grant of the minerals out of which the royalty is to arise.     When the grant, exception or reservation includes all that may ever arise, it carries the title to the mineral only by necessary implication, not by express words, because it carries the entire beneficial use of the oil.     A grant of all rents, issues and profits of land will include the land itself, for the same reason and in the same way. Jarman, Wills, 741; *Weakland* v. *Cunningham,* 7 Atl. (P.) 148. But that does not argue that the rents, issues and profits and the land out of which they come are identical or inseparable, nor that they are merged in the land.     By disposing of them completely and for all time and clothing the grantee with the entire beneficial use of the land, by conferring upon him all the rights and uses that can arise out of it and to which it is adaptable, the grantor passes the land itself by necessary implication.     Only the royalty provided for by the lease existing at the date of the division of the land is involved here.     That lease might have expired or been surrendered and the royalty thus made fruitless, or it may yet come to an end, leaving oil in the lands.     Nobody pretends that any other royalty is involved, and no decision of this court asserts that the grant of a particular royalty will pass title to the mineral.     None of the parties to the lease involved here has made any grant or reservation of royalty that

we have anything to do with. The land is the only thing that has changed in ownership.

Atlthough here and in practically all other oil producing states, an oil royalty is often called rent and treated as rent, and the relation between the lessor and the lessee as that of landlord and tenant, after discovery and production of oil, the cases holding the contrary of the doctrine enunciated and applied in *Campbell* v. *Lynch* are interpreted as having treated the royalty as pay for the oil taken out. Manifestly it is that, but it is just as clearly something more than that. Besides paying for the oil taken out, it holds the lease on all of the land and oil included within its boundaries. It maintains the lessee's right to carry his operations to every part of the tract and precludes operation or mining on any part of it by the owner and everybody else except assignees of the lessee. How then can it be said to be only pay for the oil taken out? A full and true definition of anything must accord fully with its nature and characteristics. "A definition is a description of a thing by its properties or a conception by its attributes." Webster. As a royalty does more in fact and in law than pay for the oil taken out, a description of it, calling it pay for oil taken out, is true as far as it goes, but it stops short of revelation or narration of its complete nature and character. Any intelligent layman on the street knows it does more than that and no lawyer can maintain his client's case in any court, upon the proposition that the royalty only pays for the oil taken out. He could not do so here, unless we are ready to overrule *Harness* v. *Eastern Oil Co.,* 49 W. Va. 232 and *South Penn Oil Co.* v. *Snodgrass,* 71 W. Va. 438, both of which distinctly hold the royalty from one well anywhere on the lease sustains the lessee's right over all of the leased land. It is so held everywhere, in Ohio, Indiana, Arkansas and Oklahoma, whose courts seem to say it only pays for the oil taken out.

A note found in 31 Harvard Law Review, 882, saying at page 886 "Although the reasoning in *Campbell* v. *Lynch* does not correspond to the true nature of these royalties, the result reached by the court is sound," argues that a royalty is not a rent, and cites Ohio, Indiana and Arkansas cases, as holding it to be only pay for the oil taken out. The editor's failure to

analyze that proposition, in his note, may be attributable to an impression made upon his mind by the text he quotes from Kent's Commentaries, saying rent must issue out of lands and cannot issue out of a mere privilege or easement, and from Coke upon Littleton, saying it cannot be granted out of "a piscary, common, advowson and such like incorporeal hereditaments." Of course not. But the royalty does not come out of the privilege granted by the lease. It is compensation for the privilege, if the lease creates only a privilege in the lessee. The privilege is an incorporeal hereditament exercisable in the land, and the royalty is an incorporeal hereditament issuing out of the land and compensating the owner for its use or for the incorporeal right. The definitions quoted would preclude the lessee from creating a rent out of his incorporeal right, but they no more preclude the land owner from taking a rent for the burden put upon his minerals by the granted right, than they would preclude him from taking a rent to compensate him for an agricultural lease. The one issues out of the land as truly and clearly as the other.

The theory that royalty is only pay for the oil taken out seems to rest partially upon the view that the lessee's right is a license to go upon the land and take the oil and pay for it. That view is wholly untenable. His right is everywhere held to be assignable, wherefore it must necessarily be either an estate in the land or an hereditament. No mere license is assignable. *Power* v. *Tazewells,* 25 Gratt. 786; *Hodgson* v. *Perkins,* 84 Va. 706; *Barksdale* v. *Hairston,* 81 Va. 764; *Greenwood Lake etc. R. Co.* v. *New York etc. R. Co.,* 134 N. Y. 453; *Ruggles* v. *Lesure,* 24 Pick. (Mass.) 187; *East N. J. Iron C.* v. *Wright,* 32 N. J. Eq. 248; *Pearson* v. *Hartman,* 100 Pa. St. 84; *Howes* v. *Bell,* 7 B. & C. 481; 25 Cyc. 644. It can neither be assigned, sold, conveyed, devised nor inherited. Wash. Real. Prop., sec. 842; 17 R. C. L., p. 575. An oil lease can be. An unexecuted license is always revocable, even though money may have been expended on the faith of it. 25 Cyc. 646, citing many cases sustaining the text; Wash. Real. Prop., sec. 841; 17 R. C. L., p. 576. A license carried into execution merely justifies the acts done under it, up to the date of revocation. Wash Real. Prop., sec. 839. Payment of a valuable consideration for a license does not

render it irrevocable.    25 Cyc. 649.    A license coupled with an interest or annexed to a grant is not revocable, because it is part and parcel of the interest or grant.    25 Cyc. 649; 17 R. C. L., p. 576.    Licenses executed by large expenditures of money and relied upon in important alterations of conditions, are converted into grants or contracts of sale and cease to be revocable, because they become more than mere licenses.    17 R. C. L., p. 579; 25 Cyc. 647.    The better opinion is that a parol license is revocable under all circumstances, however great the resulting injury.    *Pifer* v. *Brown,* 43 W. Va. 412; 25 Cyc. 647.    "It is an ancient and well settled doctrine of the common law that a mere license, whether by deed or by parol, is revocable at pleasure, unless coupled with an interest, or grant; or unless it is executed; or according to the rule in many jurisdictions, unless, by reason of expenditures made by the licensee on the strength of the license it would be otherwise inequitable to permit the licensor to effect a revocation."    17 R. C. L., p. 576.

The clearest and best statement of the nature, elements and qualities of a license I have found is given by Alderson, B. in *Wood* v. *Leadbitter,* 13 M. & W. 838, from which I quote: "In the course of his judgment the Chief Justice says (Vaughan, 351), 'A dispensation or license properly passeth no interest, nor alters or transfers property in anything but only makes an action lawful, which without it had been unlawful.    As a license to go beyond the seas, to hunt in a man's park, to come into his house, are only actions which, without license, had been unlawful.    But a license to hunt in a man's park, and carry away the deer killed to his own use; to cut down a tree in a man's ground, and to carry it away the next day after to his own use, are licenses as to the acts of hunting and cutting down the tree, but as to the carrying away of the deer killed and the tree cut down, they are grants.    So, to license a man to eat my meat, or to fire the wood in my chimney to warm him by, as to the actions of eating, firing my wood, and warming him, they are licenses; but it is consequent necessarily to those actions that my property may be destroyed in the meat eaten, and in the wood burnt.    So as in some cases, by consequent and not directly, and as its effect, a dispensation or license may destroy and alter property.'    Now, attending to this passage, in conjunction

with the title 'License' in Brooke's Abridgment, from which, and particularly from paragraph 15, it appears that a license is in its nature revocable, we have before us the whole principle of the law on this subject.    A mere license is revocable; but that which is called a license is often something more than a license; it often comprises or is connected with a grant, and then thu party who has given it cannot in general revoke it, so as to de feat his grant, to which it was incident.    It may further be observed, that a license under seal (provided it be a mere license) is as revocable as a license by parol; and, on the other hand, a license by parol, coupled with a grant, is as irrevocable as a license by deed, provided only that the grant is of a nature capable of being made by parol.    But where there is a license by parol, coupled with a parol grant, or pretended grant, of something which is incapable of being granted otherwise than by deed, there the license is a mere license; it is not an incident to a valid grant, and is therefore revocable.    Thus, a license by A. to hunt in his park, whether given by deed or by parol, is revocable; it merely renders the act of hunting lawful, which, without the license, would have been unlawful.    If the license be, as put by Chief Justice Vaughan, a license not only to hunt, but also to take away the deer when killed to his own use, this is in truth a grant of the deer, with a license annexed to come on the land; and supposing the grant of the deer to be good, then the license would be irrevocable by the party who had given it; he would be estopped from defeating his own grant, or act in the nature of a grant.    But suppose the case of a parol license to come on the lands, and there to make a watercourse, to flow on the land of the licensee.    In such a case there is no valid grant of the watercourse, and the license remains a mere license, and therefore capable of being revoked.    On the other hand, if such a license were granted by deed, then the question would be on the construction of the deed, whether it amounted to a grant of the watercourse; and if it did, then the license would be irrevocable."

Now, if the right conferred by an oil and gas. lease carried title to the oil and gas in place, it would also give an irrevocable license to enter upon the land and sever it and take it away.    In that case, it would be a license annexed to the grant or coupled

with an interest.   But, if the oil and gas are not granted by the lease, the license to enter and take it away is revocable although created by the deed called the lease.   But it makes no grant of the oil and gas.   By all of our decisions and by the weight of authority everywhere, it is held that the lease passes no title to the oil and gas in place.   My opponents in this controversy all admit that the oil and gas belong to the lessor and build their structure upon that proposition.

As the right of the lessee in an oil lease is exclusive, whereas a licensee is generally not, *Power* v. *Tazewells,* 25 Gratt. 786, and is assignable, devisable, heritable and irrevocable, it is clearly not a licensee.   It is manifestly more than a license.   It is at least an incorporeal hereditament, and, according to almost uniform holdings, it is a conditional estate for years in the oil and gas sands and strata of the land and in so much of the surface as is necessary to the operation of the wells, or as is included in the contract between the lessor and the lessee.   If it is a *profit a prendre,* as suggested in Harvard Law Review, it is a right in the nature of an estate in the land.   "A right of *profit a prendre* when in gross is an inheritable and assignable interest, partaking of the nature of an estate in the land itself."   Jones, Easements, sec. 52, citing many English and American cases sustaining the text.   And it is an incorporeal hereditament, not a mere license.   *Id.* sec. 49.   It is a right collateral to, and based upon the land, not an estate in the land.   In that right, as contradistinguished from the land and its title, there may be an assignable and inheritable estate for life, for years or for any definite or indefinite term.   *Id.* sec. 52.   Hence, a grant of any part of the land to which it relates or in which it is exercisable, is not essential to its creation, although, in the exercise thereof, portions of the land are taken or consumed.   If it is exclusive, extends to all of the minerals of a certain kind or certain kinds, and gives an estate in fee simple in the right, it is equivalent to a grant of the minerals, for it passes the whole beneficial interest therein, just as a grant of all rents, issues and profits of land in fee simple or forever, is equivalent to a grant of the land.   *Higgins* v. *Round Bottom Coal and Coke Co.,* 63 W. Va. 218.   It passes the title by construction only, upon the theory of necessary implication.   But, if it is granted only for life or for

years, in terms or by construction, it is not the equivalent of a grant of the minerals in place. *State* v. *South Penn Oil Co.,* 42 W. Va. 80.

If the right conferred by such a lease is only an incorporeal hereditament, as contradistinguished from an estate for years in the oil and gas bearing strata of the land, the royalty is nevertheless so much like rent that it is always regarded and treated as rent. Of a lease of land for the making of brick out of its soil, Lord Chief Justice Denman said, in *Reg.* v. *Westbrook,* 10 Q. B. R. 178 : "We come, then, to the bare objection that the royalty is paid, not for the renewing produce of the land, but for several portions of the land itself, mixed up with foreign matter : the expense of this, however, must of course have been cast off before the royalty itself was fixed. That was a sum which, after all such expenses paid, the occupier could afford to render to the landlord. When the case is thus laid bare, there is no distinction between it and that of the lessee of coal mines, of clay pits, of slate quarries : in all these the occupation is only valuable by the removal of portions of the soil : and whether the occupation is paid for in money or kind, is fixed beforehand by the contract, or measured afterwards by the actual produce, it is equally in substance a rent: it is the compensation which the occupier pays the landlord for that species of occupation which the contract between them allows. This would not admit of an argument in an agricultural lease, where the tenant was to pay a certain portion of the produce: that would be admitted to be in all respects a rent service, with every incident to such a rent: and, in *Daniel* v. *Gracie* (6 Q. B. 145), we held the same with regard to a marl pit, and brick mine, as the parties termed it, where the render was of so much per cubic yard of the marl dug, and so much per thousand of the bricks made." In *Rex* v. *Mirfield,* 10 East. 219, Lord Chief Justice Ellenborough treated a return for saleable underwood, payable every twenty-one years and on the cutting of the underwood, as rent, although the right to cut it may have been and probably was only an incorporeal hereditament and not an estate in the land. In *Daniel* v. *Gracie,* 6 Q. B. R. 145, referred to in *Reg.* v. *Westbrook,* the nature of the return or compensation came up in a technical way, on the right of distraint for rent; and Lord Denman so recognized it,

saying: "And the question is, whether in this case rent is reserved for which a distress lies. That the land was the subject of the demise was, we believe hardly questioned in the argument. Indeed, from the nature of the thing, the work in the mines or pits could not be prosecuted by the plaintiff at all without taking land in proportion to the extent of the operation." The action was in replevin by the lessee against the lessor, and based upon the theory that the plaintiff was not the tenant of the defendant and the compensation he was to pay was not rent, wherefore his goods were not liable to distress and had been wrongfully taken. Upon the theory that he was a tenant and his goods liable to distress, a verdict for the defendant was permitted to stand. In the opinion, there is a quotation from Lord Coke, saying: "And the rent may as well be in delivery of hens, capons, roses, spurs, bows, shafts &c. or other profit that lieth in render, office, attendance, and such like, as in payment of money." In *Rowls* v. *Gells.* 2 Cowp. 451, the royalty of lead mines was payable in kind, and Lord Mansfield said: "But as such obligatory payment is in respect of the land, the land owner ought not to receive it clearer or neater than any other part of his estate." Note that he says it is "payment in respect of the land." Then it issued out of the land and comes within the essential and basic requirement of rent, although the mining right compensated for by it may not have been an estate in the land or the minerals. See also *Rex* v. *St. Agnes,* 3 T. R. 481. On the same principle, a return or compensation for right to fish in a pond or to hunt on land may be a rent, although all authority says it is not an estate in the land, and is only an incorporeal right. Our decisions and the courts everywhere say the delay or commutation money paid by a lessee in an oil lease, while his right in the land extends only to exploration or hunting for oil instead of game, is rent. · *Roberts* v. *Bettman,* 45 W. Va. 143; *Friend* v. *Mallory,* 52 W. Va. 53; *Smith* v. *South Penn Oil Co.,* 59 W. Va. 204.

Our decisions are not definite and positive in terms as to the character of the lessee's right under an oil and gas lease. Perhaps in no instance has there been necessity for an accurate definition of it, until the inquiry now under consideration arose. In *State* v. *South Penn Oil Co.,* 42 W. Va. 80, it was necessary

to determine its character for purposes of taxation, and it was there held not to be title to the oil and gas in place. The court called it, in its inception, that is before discovery, a privilege, liberty, or license to dig and remove the minerals. It is further said that, after discovery and by production, the lessee acquired no estate either in land or minerals, but only "the right, for a limited period, to work the land for oil." By all authority that right to work the land for oil has a legal status. Being more than a mere license, as shown, it must be either an incorporeal right to dig and take away the oil, or an estate in the land, either absolute or conditional, and it may be either. In neither case, would it carry title to the oil in place, unless it amounted to a grant in fee. It could be an estate in the oil or the land for years, without vesting title to the oil in place in the lessee. A mere tenant of any kind does not take title to the land, nor, unless he has a freehold, is it assessed to him for taxation. Later cases declare the lessee's right to produce oil, after discovery, is a vested right. *Lowther Oil Co.* v. *Miller-Sibley Oil Co.,* 53 W. Va. 501; *Parish Fork Oil Co.* v. *Bridgewater Gas Co.,* 51 W. Va. 583; *Lowther Oil Co.* v. *Guffey,* 52 W. Va. 88; *Steelsmith* v. *Gartlan,* 45 W. Va. 27. But they do not define the right in terms. They leave it a nameless right. But it is defined by the treatment accorded in many decisions here and elsewhere. It may be terminated by abandonment or surrender as an estate for years may be terminated. *Sult* v. *Hochstetter Oil Co.,* 63 W. Va. 317; *Henne* v. *South Penn Oil Co.,* 52 W. Va. 192; *Steelsmith* v. *Gartlan,* 45 W. Va. 27; *Parish Fork Oil Co.* v. *Bridgwater Gas Co.,* 51 W. Va. 583. While an easement, one form of incorporeal hereditament, may be lost by abandonment, it requires much stronger evidence and a more conclusive state of facts to make out loss or extinguishment of such a right than in the case of an estate for years. Mere non-user of right to dig ore from the land of another, continuing over a period of forty years, has been held not to have wrought an abandonment of it. *Arnold* v. *Stevens,* 24 Pick. (Mass.) 106. The cesser of use must be accompanied by acts clearly indicating intent to abandon the right. Jones, Easements, sec. 863. Mere failure to prosecute the work of mining under our oil leases, after discovery of oil, amounts to an aban-

donment of the lease.  *South Penn Oil Co.* v. *Snodgrass,* 71 W. Va. 438; *Crawford* v. *Ritchie,* 43 W. Va. 252; *Lowther Oil Co.* v. *Miller-Sibley Oil Co.,* 53 W. Va. 501; *Parish Fork Co.* v. *Bridgewater Co.,* 51 W. Va. 583; *Steelsmith* v. *Gartlan,* 45 W. Va. 27; *Henne* v. *South Penn Oil Co.,* 52 W. Va. 192.

The stress sometimes laid upon the holding that, until discovery of oil, the lessee has only an inchoate or contingent right of exploration, does not signify much when the relation between the lessor and lessee is examined in the light of the law of estates and of landlord and tenant, and the incompleteness of the right fits into that law perfectly.  There may be a grant of an estate for years and yet no relation of landlord and tenant, no tenancy, although one is contemplated and provided for.  However definite and complete the contract, there is no tenancy until the grantee enters upon the land and begins the work or use for which it was demised to him.  Tiffany, Land. & Ten., p. 290, sec. 37.  The purpose of an oil lease is production of oil.  When that begins, there is, according to our decisions and the weight of authority, a tenancy on the part of the lessee.  *Venture Oil Co.* v. *Fretts,* 152 Pa. St. 451; *McNish* v. *Stone,* 152 Pa. St. 457; *South Penn Oil Co.* v. *Snodgrass,* 71 W. Va. 438; *Ammons* v. *Toothman,* 59 W. Va. 165.  In *Glasgow* v. *Chartiers Oil Co.,* 152 Pa. St. 48, the court defined the relation of the parties in these words: "If he, (the lessee), explores and finds oil or gas, the relation of landlord and tenant or vendor and vendee is established, and the tenant would be under an implied obligation to operate for the common good of both parties, and pay the rent or royalty reserved." Since both here and in Pennsylvania, it is held that the title to the oil does not pass by the lease, the relation must be that of landlord and tenant, when production starts.  For most, if not all, purposes, there are only three classes of rights men may have in lands owned by others, licenses, incorporeal hereditaments and estates.  Prior to production, there is a binding contract between the parties, just as in any other case of a lease under which possession has not been taken, a contract contemplating and providing for a tenancy.  Under an agricultural lease, the lessee could go upon the property and inspect it and no doubt perform other acts, without establishing the relation of landlord and tenant.  So, here the lessee does

certain acts that must be done, before it can be established. That does not signify any weakness or infirmity in his contract nor argue anything against a tenancy yielding rent, when he has discovered oil and commenced production. The beginning of the relation requires preparation different from, and more extensive than, that preceding establishment of the relation under an agricultural lease. The lease, the contract, grants an estate for years in the land in both instances and carries certain licenses or preliminary privileges, which the grantee exercises. Under the oil lease, this preliminary license, made irrevocable by its annexation to the grant, is often continued over a long period of time, by payment of delay rental; but that does not change its legal character. It is a privilege, irrevocable license or incoporeal hereditament, until the production begins, establishing the relation of landlord and tenant. Neither the delay in production, the nature of the preliminary acts, nor the changes of relation alter the character of the contract. What it is at the end it was in the beginning. It then provided for and made possible all that has been done under it. From the moment of its delivery, everything done under it and every result and consequence emanating from it, including right to royalty, have potential existence, and, when they come into actual being, they go back by relation to that moment for their legal foundation, character and qualities. Delay of the tenancy and existence of a right of exploration are not at all inconsistent with the theory of a grant of an estate for years in the land. It is not unusual for men to own estates for years, without having actual possession of them. That occurs every time a person leases a house or farm, as of a certain date, and does not take possession of it until some later date. The oil lease does not postpone right of possession in the lessee. He may enter and drill at once, and if he should do so on the day of the date of the lease and find oil that day, he is a tenant in the full sense of the term from that very day. Owing to the nature of the property and the purpose of the tenancy, the latter seldom if ever begins contemporaneously with the lease. Though legally possible, it is not actually practicable. But the legal possibility proves there may be and is an estate in the lessee from the beginning. The money rent begins on that date whether payable

in advance or not. When the relation changes to tenancy, the royalty, or rent in kind, is substituted for the money rent. A change in results attends the change in relation, and all these changes occur under the contract and without any change in it. The term begins to run on that date, and, ordinarily, the oil lease has a term, just as other leases have, and that term is a vital and controlling part of it. *South Penn Oil Co.* v. *Snodgrass,* 71 W. Va. 438; *McGraw Oil Co.* v. *Kennedy,* 65 W. Va. 595; *Ammons* v. *Toothman,* 59 W. Va. 165.

The operations carried on under an oil lease are not in their nature mere acts done upon the land. They require the use of portions of the surface, and the lease gives right to use every foot of it, not expressly excepted or reserved, if necessary. Structures and machinery more elaborate and costly than are commonly used for many other tenancies are necessarily installed, and the occupation of the land, in the event of the discovery of oil in paying quantities, continues longer than is usual and customary under those leases. The fact that the lease carries certain licenses or privileges, both before and after establishment of the relation of landlord and tenant, is not legally inconsistent with the grant of an estate for years in the land, nor with a rental by way of compensation for the term or use of the land. Strictly speaking, a rent cannot issue out of personal property, and, if a rent is reserved in a lease of both land and chattels, the whole rent is considered as issuing from the land. *Farewell* v. *Dickenson,* 6 Barn. & C. 251.

Another fact to be observed and having some bearing upon the construction of such leases, and particularly the legal status of the royalty, is the obligation of the lessee to deliver the royalty into the pipe-line, to the credit of the lessor. It is not in terms, a reservation or exception. In form, it is like any other covenant or agreement to pay rent in kind. The only effort to make it anything other than rent, found in the English decisions, is a suggestion by Lord Cairns, in *Gowan* v. *Christie,* L. R. 2 H. L. So. 273, that the royalty is an exception from the grant of the mineral. Stated in his own words, the proposition is: "What we call a mineral lease is really, when properly considered, a sale out and out of a portion of the land." But this view was not accepted by the House of Lords. The Lord Chancellor

and Lord Chelmsford put their decisions on the relation of landlord and tenant. The suggestion was adverted to by Lord Chancellor Halsbury in *Greville-Nugent* v. *McKenzie,* 1900 App. Cas. 83, but he admitted it was not the law of England, saying: "As I have said, I am not quite certain that if this matter were *res integra,* and if we were sent back 200 or 300 years, one would be quite able absolutely to follow all the reasoning by which that result is arrived at: (title of the life tenant to mineral royalties), but it is immaterial to do so now, because that point has been ascertained and adjudicated upon over and over again and finally in this House." In Pennsylvania, a coal lease is construed as effecting a sale of the coal in place. *Fairchild* v. *Fairchild,* 9 Atl. 255. But, as has been shown, oil and gas leases are not, nor are they in this state.

If it can be said that, to the grant of an estate for years in the land, a license to sever and take out the oil is added or annexed, the royalty would be compensation for both the estate and the license, and it cannot be apportioned between them. Moreover, the estate is the primary subject and the license only an incident of the estate, in legal contemplation, for the license is annexed to the estate and not the estate to the license. On its face and in terms, the contract leases, demises and lets the land and then declares the purpose of the letting. Literally, it grants an estate for years and annexes to it a license to take the oil. The estate prevails over the license in rank, because it is a right of a superior nature, an estate being an interest in the land and irrevocable, while the license, without the estate, would carry no interest in the land and would be revocable at the will of the licensor. To call the royalty rent for the land, the subject matter of the estate, the principal and superior element of the lease, is therefore, both reasonable and accordant with legal principles. To say the license is part and parcel of the estate and that the royalty is the rent stipulated for in respect of the estate is still more so. The preliminary license to explore is treated by the parties as an inclusive right, for there is an agreement to pay periodical rent, which must be complied with, whether the lessee explores or not. It is not compensation for injury to the land occasioned by exploration, nor for occupation of the land in exploration. It is called rent and treated as rent, and

the royalty, when produced, takes its place. On the establishment of the relation of landlord and tenant, the rent merely changes its form and rate. As already stated, the lease usually provides that the royalty shall be paid in lieu of the money rent which ceases. Since the preliminary license is clearly inclusive, the license to sever is presumptively so, because it is created by the same instrument, and annexed to the same estate, as the other.

The demonstration, conclusive in my opinion, that an oil royalty is (1) a legal entity separate and distinct from the land and oil in place and their titles, though related to them, whether it is a rent or not; (2) substantially a rent and governed and treated as rent; and (3) technically rent; sustains the major and basic proposition on which the decision in *Campbell* v. *Lynch* stands. Being such an entity it is not the land, oil nor title to either. It may be owned, held, enjoyed and assigned, by the owner of the land. It is not merged in his title to the land. It is not an estate in the land. It is an incorporeal hereditament whose owner has an estate in it, besides and collateral to his estate in his land, whether it is rent or not. If not rent, it is more like rent than anything else conceivable or known to the law and is generally treated as rent, wherefore the principle of analogy requires rights respecting it to be tested by the rules and principles governing rents. It is technically rent payable in kind and, therefore, must be governed by those principles and rules, one of which is, as shown in *Campbell* v. *Lynch,* that, on a division of the land out of which it issues, it must be apportioned among the owners of the parts into which the land is divided, in proportion to their values.

The doctrine of apportionment of rents upon a division of the land embraced by a lease is conceded in the opposing opinion. Dissenting opinion in *Campbell* v. *Lynch.* But it is argued that the rule is applicable only in the case of a general lease, one covering the whole estate in the land. An oil lease is general. It covers every portion of the land leased. The severance authorized pertains only to the oil, and, in that sense, it is limited to the oil sands or strata. But every other lease is similarly limited. An agricultural lease limits the use and enjoyment of the land to the surface. Nevertheless, it embraces all

of the land. The reversioner cannot go in and tear up the surface by mining or other operations materially interfereing with the tenant's use and enjoyment of the surface, unless he has reserved the right to do so, and the tenant himself cannot open mines, unless the right to do so is vested in him by his lease. The mining lessee has not only the use of the seam or seams leased, but also of such portions of the surface as are contracted for expressly or impliedly. Obviously, there is no merit in this contention. Another argument against its application here proceeds upon an hypothesis that is practically impossible, because it is baldly unreasonable. It supposes a state of facts so manifestly unreasonable that it likely never has occurred and never will. Nobody ever leased, solely for corn-growing, an entire tract of land, only a relatively small portion of which will produce corn, or an entire tract of land to obtain the use of a relatively small portion of it for fruit-growing, and bound himself to pay rent for the whole of it. Such a thing is legally possible, however, and, if it should occur, the doctrine of apportionment of rent would most certainly apply. The test of the legal status of the rent is not the use the lessee makes of the leased land. It is what he agrees to pay. *Higgins* v. *California P. & A. Co.,* 109 Cal. 304. Even though he should not use the land at all, his agreement to pay rent binds him. A lessee can no more escape payment of rent, on the ground of non-use of the land than he can escape payment for a suit of clothes he has bought, by not wearing it. Property of all kinds may be dead-rented, and often is. A lessee is bound to pay the rent he contracts to pay, whether he ever becomes a tenant or not. If he agrees to pay rent on an entire tract of land, the rent attends and goes with the reversion in the entire tract, no matter what he rents it for or uses it for, or whether he uses it at all; and, when the reversion is divided, the rent is divided, unless there is a special agreemnt to the contrary. But a man desiring land only for corn-growing, out of a large tract partly adapted to that use and partly unfit for it, would lease only the suitable part, and a man desiring land out of the tract for fruit-growing, would lease only the part adapted to that use If, after a corn lease has been put upon one part and a fruit lease upon the other, the land should be so divided as

to give one party all of the corn land and the other all of the fruit land, there would be no apportionment, of course. But, if it should be so divided as to give each a portion of each leased part, both rents would have to be apportioned. Another practically impossible case is stated, for illustration, in respect of timber. Nobody in this country leases land for timber cutting. The deed always grants the trees in some form, either expressly or by necessary implication, conditionally or absolutely. *Adkins* v. *Huff,* 58 W. Va. 645. The deed or contract never takes the form of a lease nor contains any provision for compensation that can be reasonably assimilated to rent. But it is said the owner of the purpart on which the mining is done may be prejudiced and injured in this; that, while the lease is in force, oil may be taken from his land only and operations may not be extended to the other parts, so as to give him a share in any royalty arising from them. This argument also supposes a case, excluded by the theory of every lease as well as by experience in the oil business. When oil or gas is discovered within the bounds of the lease, the lessee has a motive for full development of the whole lease and production of all the mineral in it, and his failure to produce all of it, when it happens, if ever, is purely accidental. He omits some of it, because he does not find it or because he errs in judgment as to its quantity. Ordinarily, a lease is abandoned, if at all, before any mineral is taken out, and all of the parts released from its burden. But the possible prejudice applies in all kinds of leases. Under an agricultural lease, one part of the land may be subjected to a greater burden, by the tenant, than others. He may practically exhaust its fertility, and render it useless for years. Surely, there can be no merit in such argument. Here again, I repeat that the contract, not the use of the land, fixes the status of the rent. *Higgins* v. *California P. & A. Co.,* cited.

The reiterated fact that the owners of the several parts take, respectively, all the title and estate the ancestor, testator or bankrupt had in his part, argues nothing against the principles or conclusions underlying the decision in *Campbell* v. *Lynch.* They do get it. They get the legal title to the oil and gas as well as the land. But they take it subject to a burden, an incumbrance, just as in the case of a division of a tract of land,

86 W. Va.

encumbered by an agricultural lease    They get all of the title
and estate in the land, but, in that, they get only the reversion,
for that is all their predecessor had.    Being asiggnees of the re-
version, they are, by all authority except the unsound decisions
in this class of cases, entitled to the rent which was legally at-
tached and annexed to the reversion, while he held it, and legally
went with it to them, it not having been detached therefrom by
any agreement.    It was a right, an incorporeal hereditament,
legally attached to the land and collateral to the title, constitut-
ing one of the incidents of title or ownership, and accompanying
it into whosesoever hands it might go, unless reserved or de-
tached by a reservation or assignment thereof.    In none of these
cases, had it been so detached.    "The reversion may be granted
away, reserving the rent, by *special words;* but by a *general*
grant of the reversion, the rent will pass with it as incident there-
to." Bl'k. Com. B'k 2, p. 176.    The admission in the dissenting
opinion in *Campbell* v. *Lynch,* that rent arising under a general
lease, is apportionable, in the event of a division of the land,
necessarily admits this doctrine and also that a rent is a legal
entity distinct from, but collateral and incidental to, the land.
Hence, this whole controversy narrows down to a single issue,
namely, whether the royalty in an oil and gas lease is technically
or substantially a rent.    That it is, there cannot be the slightest
doubt.

For the most part, the decision in *Kimbley* v. *Luckey,* (Okl.)
179 Pac. 928, is predicated upon Ohio, Indiana and Arkansas
precedents, the dissenting opinion in *Campbell* v. *Lynch* and
the decision in *Pittsburg etc. Co.* v. *Ankrom,* the fallacies and
unsoundness of which, I think I have fully and clearly demon-
strated.  It admits the doctrine of apportionment of rents, but
attempts to exclude it on two grounds, (1) lack of provision for
it in the contract, and (2) inapplicability to tenancies under oil
and gas leases in that state.    The first ground of exclusion is
baldly and obviously unsound.    To effect apportionment, in
case of division of the land, no contract therefor is necessary or
required in any jurisdiction.    The law makes the apportionment
as a legal result of the division, in the absence of an agreement
excluding it.    An agreement is required not to apply the doc-
trine, but to prevent its application.    It was not provided for by

contract in any of the cases cited in *Campbell* v. *Lynch*. Read this ancient law: "A proportionable part of the rent *passes immediately* with the reversion, and the tenant is not prejudiced by the remedies which follow the right, because it is in his power, and it is his duty, to prevent the several suits and distresses by a punctual payment." I Thom. Coke, 366 n 369, quoted in *Reed* v. *Ward*, 22 Pa. St. 144. See also *Bank* v. *Wise*, 3 Watts (Pa.) 404. Read also this modern law: "So in case of a transfer of the reversion in a part of the premises the transfer carries with it a proportionate part of the rent; such a transfer in no sense constitutes a wrong to the tenant and therefore the law will apportion the rent." 16 R. C. L. p. 916, citing, among other well considered cases sustaining the text, *Swint* v. *McCalmont Oil Co.*, 184 Pa. St. 202, involving an oil royalty; and L. R. A., 1915 C. note, p. 223.

The other ground upon which the Oklahoma Court excludes application of the common law doctrine is, I submit, equally baseless. It is that that Court knows, as a matter of common knowledge, that it has been the general, if not universal, custom in that state, from the first discovery of oil and gas, for the royalty to be paid the owner of the lands on which the wells were located, and from which production was had. If the relation of landlord and tenant exists between the lessor and lessee, as clearly it does, no such custom, however long continued, can change the law applicable to that relation. And, even though the royalty be not strictly and technically rent, it is more like rent than anything else legally conceivable and is generally treated as rent, wherefore the principle of analogy, which courts universally apply in doubtful cases, obligates courts and judges so to regard and treat it. In *Rennell* v. *Bishop of Lincoln*, 3 Bing. 224, 266, Best, C. J., said: "I endeavored to find other cases from which I could safely reason by analogy to that now to be decided." In *Morris* v. *Clarkson*, 3 Swanst. 559, 561, Sir. Wm. Grant, M. R., said: "It is necessary, therefore, to proceed upon principle, and decisions in analogous cases." On legal denmands, we apply the statute of limitations in equity, by analogy. *Thompson* v. *Whitaker Iron Co.*, 41 W. Va. 574; *Smith* v. *Wehrle*, 41 W. Va. 270; *Wilson* v. *Harper*, 25 W. Va. 179. I have no doubt there are thousands of instances noted in the

books, in which the principle has been recognized and followed. Here is the closest and strongest analogy possible, wherefore it is binding upon the courts and citizens alike. But how does the Oklahoma court judicially know what it assumes to know, if it be true? We judicially know oil development of noticeable proportion, in Oklahoma, does not date back beyond the year 1900, for it is an historical fact. It has existed in this state at least three times as long, and we are not judically advised of any such general or uniform custom. No authority is cited for the proposition that a court can take judicial notice of such transactions, if they have occurred, and I seriously doubt the existence of such authority. They are neither historical nor scientific facts nor general usages and customs of trade or conduct. They are mere isolated transactions between individuals in dealings in property that may be handled in a variety of ways. Moreover, I do not understand that custom or usage makes law in the general sense of the term, unless it is ancient. It may become a part of a contract by actual or presumptive adoption, but the decision is not put upon the ground that the particular contract was made with reference to any general or particular custom. To be a law, a custom must have existed for so long a time that "the memory of man runneth not to the contrary." 1 Bl'k. Com., pp. 76, 77; *Ulmer* v. *Farnsworth,* 80 Me. 500; *Freary* v. *Cook,* 14 Mass. 488. Fifteen or twenty years will not suffice. As this supposed custom cannot have the force of law, the decision could have no other foundation than the opinion of the court as to what the law of the subject is, as determined by legal principles and the analogies of the law; and, in them, it has no foundation as has been clearly demonstrated.

Lastly, it is argued in the Oklahoma case, that the owner of the part of the land from which oil is not produced is not entitled to any portion of the royalty, because it cannot be assumed that there is any oil in it. For the purposes of every oil and gas lease, in contests over rights under them, it must be assumed that there is oil and gas under every part of the land embraced in the lease, until the contrary has been shown. The parties to the lease assume its existence and contract with one another, upon that assumption as a basis. Having done so, they cannot deny the truth of the fact, and courts must take the contract as

they made it and bound themselves by it. I have no doubt the Oklahoma trial courts have so treated and enforced such leases, nor that they have been sustained in such action by the court of last resort. When a trespasser enters upon such a lease and begins drilling for oil or gas, an injunction at the suit of the lessee lies to restrain him, without proof of the existence of the minerals in the land. *Trees* v. *Eclipse Oil Co.,* 47 W. Va. 107; *Eclipse Oil Co.* v. *South Penn Oil Co.,* 47 W. Va. 84; *Bettman* v. *Harness,* 42 W. Va. 433. A mere trespass is not enjoinable. The injunction must go to prevent the taking out of oil, working irreparable injury to the lessee. "There is no exception to the rule that the fair and voluntary execution of a sealed instrument is conclusive, upon all who seal it, of everything admitted in it." *Hoke* v. *Hoke,* 3 W. Va. 561; *Point Pleasant* v. *Greenlee et al.,* 63 W. Va. 207; *Monteith's Case,* 15 Gratt. 172.

I have already quoted authority holding that the lessee has no legal ground of objection to apportionment, on account of the slight inconvenience it may occasion him. Nor, in case he has paid all of the royalty to one of the parties; is there any danger of liability to others for their shares. After the division, the parties entitled to the rent have a joint or joint and several demand against the lessee for it. *Kitchen* v. *Buckly,* 1 Lev. 109; *Kidgeley* v. *Lovelace,* Carthen, 289. Holt, 74, 12 Mod. 45. This is not said by way of decision, for the question is not before us, but the observation is germane. A demand of that nature may be discharged by payment of the whole amount thereof to any one of those entitled to it. *Hatfield* v. *County Court,* 75 W. Va. 595; *Allen* v. *South Penn Oil Co.,* 72 W. Va. 155.

The opinion in *Pittsburgh etc. Co.* v. *Ankrom* admits the hardships resulting from the application of the doctrine of that case. It is also admitted in the opinion delivered in *Lynch* v. *Davis,* 79 W. Va. 437, 442. I here state what I have been reluctant to mention, although it has been apparent all the time, namely, that the construction opens wide the door to the rankest kind of imposition. The lessee can drill on any one of the parts he may see fit to select, and he may make his location depend upon what he can get the owner of one of the parts to concede to him, by way of inducement. He can delay and bargain with the different parties until he obtains a bonus or re-

ward in money or a share of the royalty for drilling on his part, and, in consideration of his draining the oil from the other parts through the wells on that part. He may dicker with one owner so as to obtain the royalty in his part or a share of it, and thus drain the other parts for his own benefit. There would be no fraud in such a transaction, if properly construed, the lease permits it, as a majority of the Court say it does. It would be legally justifiable, under their construction, and yet, in many instances, it would be ruinous to all of the parties save one of the owners and the lessee. The tract may be small and rich in oil. In many instances, highly productive wells are put down on neighboring or adjoining town lots. A single well located on one of the five parts into which a five or ten acre lot may be divided will take out all the oil under all of the parts, to the enrichment of the lessee and the owner of that part and the utter deprivation of the owners of the other parts, of what legally as well as morally belongs to them. . It is suggested in the Oklahoma case, that the injured parties in such case might have legal remedies for their protection. They would not unless some court could find a way to split a single lease into two or more leases, against the will of the lessee and in violation of the terms and legal effect of his lease. I know of no principle upon which that can be done. His contract as made, obligates him to take out the oil with reasonable diligence and protect only the exterior boundary lines of the tract of land embraced in his lease. Can any court impose upon him the further obligation of protection of a dozen interior division lines? He has done nothing to alter the character of his contract. The addition of such an obligation cannot be founded upon any conduct of his, for he is proceeding to do just what he contracted to do,— take out the oil with due diligence and protect the exterior lines. When and how did any court ever obtain authority to make new contracts for men, or to alter them according to its notion of what they should be? I predict that no court will ever hold that any such additional obligation can be imposed.

The doctrine of *Campbell* v. *Lynch* and *Lynch* v. *Davis* exposes the lessee to no possible danger, gives him all he is legally or morally entitled to and imposes no burden upon him that he would not have been under, if no division of the land had oc-

curred.   Why he should be dissatisfied with it and stubbornly and relentlessly resist it upon all occasions, I am unable to understand, unless he has somewhere endeavored to avail himself of the unconscionable advantage for which the other construction opens the way, and fears his hold upon it may be broken.   That is the only way in which he can lose anything, under the construction for which I contend, and what he would so lose he has no moral right to.

### Respecting Judge Miller's Opinion.

In his opinion concurring with Judge RITZ, Judge MILLER wholly misapprehends the propositions laid down, and the conclusions drawn from them, in the foregoing opinion.   The most diligent search and the closest scrutiny by the most astute mortal on earth will not reveal a statement nor an intimation therein, "that the oil in place, burdened with the lease previously executed, did not go to the devisees under the will."   I very emphatically said they did.    I quote this from my opinion: "They (the owners of the several parts) do get it.   They get the legal title to the oil and gas as well as the land.   But they take it subject to a burden, an incumbrance, just as in the case of a division of a tract of land, encumbered by an agricultural lease."    Is that not plain, distinct and emphatic?

Laboring under this misapprehension, he endeavors to run my ultimate conclusion down to some sort of a vaguely indicated absurdity.  Having stated what I did not say and the exact contrary of what I did say, he asserts one of my purposes is to support the contention "that the royalty thus reserved out of the oil is rent."   I have not said the royalty was reserved in any such way, nor that it was "reserved" at all, nor that, legally speaking, it is a share of the oil or oil at all.   It is the right to demand and have from the lessee, first money, until production, and then oil in lieu of money; the right being an intangible thing, like the right to have a promise or agreement performed, and being further, what the law terms an incorporeal hereditament. As to the oil to be delivered in satisfaction of the right, like money paid in discharge of a debt, it exists before production, as well as after.   In legal contemplation, it is not the oil either in place or after severance. I have plainly and distinctly

said so in the opinion. Quoting again, I take this from it: "It (an oil royalty) is a right to a share of the oil taken from the land, not the oil when produced, which is only the product or fruit of the right." And I predicted that assertion on Blackstone's language, saying: "An incorporeal hereditament is a right issuing out of a thing corporate * * *. It is not the thing corporate itself * * * ; but something collateral thereto * * * . And indeed, if we would fix a clear notion of an incorporeal hereditament, we must be careful not to confound together the profits produced, and the thing or hereditament, which produces them."

The two basic propositions of my position, as set forth in *Campbell* v. *Lynch* and in my dissenting opinion in this case, are that the lease vests, (1) in the lessee either an estate for years in the land, in consideration of rental to be paid first in money and then in oil, which does not include nor carry title to the land or oil, or an incorporeal hereditament, the right to take out the oil, in consideration of rental or quasi-rental to be paid in money and then in oil, which does not include nor carry title to the land or the oil; and, (2), in the lessor, another incorporeal hereditament, the right to demand and have from the lessee the rental or quasi-rental called royalty, from time to time, as it shall become due and payable. No intelligent reading of the two opinions or either of them will fail to disclose these two propositions, nor will it disclose anything inconsistent with either of them, unless it be a possibly inaccurate statement in the former opinion, 81 W. Va. 379, saying the royalty is "the fruit of a burden upon the title created by a covenant running with the land." What I intended to say was that it was the consideration for the burden and the fruit or product of the incorporeal right to demand and receive it. Production makes the lessee's estate for years or incorporeal right to take the oil, whichever it may be, and the lessor's incorporeal right to have a share of it. each bear and yield its fruit or product, like a tree or vine. Neither of these rights is the oil itself in place or out of place, and neither issues out of the other. They are separate and distinct, though related, rights, and each pertains to the land, the former being a right to do things on the land and take away part of it, and the other a right of compen-

sation to the owner of the land, for the use and occupation thereof allowed by the lease for the exercise of the other right upon and in the land. I have repeatedly declared with emphasis that neither of these rights is the land, the oil in place or out of place, nor the title to either the land or oil or any part of either of them. If the former is an estate for years, as I have demonstrated it is, the royalty is strictly and technically rent. If the former is only an incorporeal right exercisable upon and in the land and all of it, if the lessee sees fit to use all of it, then the royalty is substantially rent, quasi-rent, the practical equivalent of rent, and governed by rules and principles of the law of rent, because they better apply to it, more nearly fit it in all respects, than any other rules and principles to be found in all the realm of the law. Being so treated, it is no part of the land or oil or the title to either of them, and, yet, by all law, it is a separate and distinct legal entity.

My admission that a rent cannot issue out of an incorporeal hereditament, was and is accompanied by an explicit declaration that the royalty provided by an oil lease does not issue or come out of the right granted to the lessee, his incorporeal hereditament, if it is one and not an estate for years in the land, nor out of such estate, if his right is such. In proof of this, I again quote from what I have said: "But the royalty does not come out of the privilege granted by the lease. It is compensation for the privilege, if the lease creates only a privilege in the lessee. The privilege is an incorporeal hereditament exercisable in the land, and the royalty is an incorporeal hereditament issuing out of the land and compensating the owner for its use or for the incorporeal right." In the face of this plain statement, how can my learned associate complacently say, with any degree of consistency, that the theories I apply are self-contradictory, or intimate that I have said the royalty issues out of the incorporeal right, or is part of the oil or identical with the oil? If he does not mean what he says and intends to say my theories or one of them is legally impossible, he has not indicated which one he regards as being impossible, nor given us any authority for his opposing position other than a few decisions of other courts, which have never attempted to disprove either of them and his own mere *ipse dixit,* while I have fully and clearly

demonstrated and proved the soundness and perfect consistency of both theories, the separate and distinct characters of the two rights and the issuance of the royalty out of the land, within the legal meaning of the word "issue" as used in this connection, by the best and most highly respected authorities to be found in English and American jurisprudence. I have not merely made an assertion and called upon my opponents to accept it or prove it untrue.

Recurring to Judge MILLER's false premise arising from misinterpretation of what I have said, which is flatly contradicted by what I have said, I renew my effort to enlighten him as to what my position respecting the status of the royalty was at the date of transition of the title to the land and oil from the testator to the devisees. The oil in place, title and all, went to the devisees by will. But it was not the royalty and did not include the royalty. They collectively took all the right, title and interest in the land, the testator had. But that did not include the royalty. They did get the royalty, which was a separate entity, as a legal consequence and result of the acquisition of the title to the land and oil, just as a man by legal consequence gets the interest on a debt past due, in the absence of a contract stipulating for it. It passed to them as an incident of their ownership of the land and oil. Before the will took effect, it was held by the testator as an incident of his ownership of the same land and oil. In neither case was it title to the land or oil, in whole or in part, nor included in the title. It was a collateral right based upon contract, intangible as many other rights evidenced by notes, bonds, contracts and covenants in deeds are, and just as firmly imbedded in law as they, and it attended and accompanied the ownership of the land, whether in the hands of its creator or his alience, unless detached from it by contract. Without that, the devisees did not get all the rights of the testator in, attendant upon and annexed to the land. Without it, they got his encumbered title, but not an important collateral right which the law annexes to the title, unless it is reserved or detached by contract, as an off-set to, or compensation for, the incumbrance. In the testator's hands, this incorporeal right, be it strictly rent or not, was an entirety as well as an entity and was not divided among the devisees by the

will, for the will does not mention it.  But, as each devisee obtained a portion of the entire land out of which it issues and to the title of which it is legally annexed, the law apportions it among them as it does in every other case of contractual, judicial or testamentary division of a tract of land encumbered by a lease and yielding an entire rent.  It was in his hands an intangible, contractual right, called an incorporeal hereditament because it is intangible, issuing out of his land because the contract related to it and made it yield him a return for its use and occupation by the other party to the contract; or, more accurately speaking, conferred upon him the right to make it yield such return, for it entitled him to the return in money or oil, whether the lessee used the land or not.  It stood upon the contract not the title nor the use of the land.  On this point, as well as in reply to arguments against my position, I quote the following from *Higgins* v. *California P. & A. Co.,* 109 Cal. 304: "The fact that, prior to the commencement of this action, the lessee had elected to mine only in that part of the deposit lying within the Ashley tract detracts nothing from the right of Higgins to demand his proper share of the royalty, nor from the obligation of the defendant to pay it.  The royalty of fifty cents on each ton of rock mined was, by the terms of the lease, to be paid to the lessors, not to the individual lessor from whose land the rock may have been mined.  The lease does not restrict the mining to any particular part of the deposit at any time. *  *  *  The royalty per ton of rock mined is but a mode of estimating the rent to be paid for the right to occupy exclusively the whole premises demised, and to mine any part or all parts thereof at any time during the term, at the election of the lessee."  In laying down the unjust and oppressive rule to which a majority of this court are about to commit themselves, the Ohio, Indiana and some other courts have ignored the legal basis of that well considered decision awarding a just and equitable result, and have substituted for it considerations of mere expediency and hyper-technical assumptions that do not bear the application of legal tests.  In all other similar cases, the contract is allowed to control and define the rights of the parties.  Here, these courts set it aside and substitute their own creations for it.

That, while a man owns land, he cannot also own a right collateral to the land, created by a contract relating to his land, is a new doctrine to me. There was a time, we are told, when men did not or could not have any notion whatever of a promise or agreement as the foundation of a civil right or obligation enforceable by any sort of legal procedure. Sale and exchange were known to the law only as completed transactions, leaving no outstanding duty to be enforced. In the case of a loan, the lender claimed, not what had been promised him, but the very thing he had loaned. Pollock and Maitland, His. Eng. Laws, vol. 2, p. 185. To find a trace of this primitive legal infirmity, in modern jurisprudence, evidenced by the line of decisions upon which a majority of this court now rely for their position, is truly amazing.

Every rent is created by a contract express or implied. It is a right given by the contract, not money or property produced by the right, although that is often called rent. According to all authority, a rent so created "issues out of the land", not out of the lessee's estate in the land. "Rent is a return or compensation for the possession of some corporeal inheritance. A certain profit, either in money, provisions, or labor, issuing out of lands and tenements, in return for their use." Bouv. Law Dict. Substantially the same definition is found in 2 Kent's Commentaries 460. It is the compensation received by the owner of the soil from the occupant thereof. *Lombard* v.*Boyden,* 5 Allen (Mass.) 254; *Bledsoe* v. *Nixon,* 60 N. C. 89; *Fisk* v. *Brayman,* 21 R. I. 195; *Clarke* v. *Cobb,* 121 Cal. 595; *Parsell* v. *Stryker,* 41 N. Y. 483; *Otis* v. *Conway,* 114 N. Y. 628; *Payne* v. *Beal,* 4 Denio (N. Y.) 412; *Van Wicklen* v. *Paulson,* 14 Barb. (N. Y.) 655; Words and Phrases. This definition applies to the many thousands of instances in which leases have granted an estate for years and the lessee has agreed to pay rent. In all of them the rent is deemed to issue out of the land, not out of the estate granted. It is compensation for the use of the land. That is what is meant by its "issuing out of land." The royalty in an oil lease is just as clearly compensation for the use of the land as the rent payable under an industrial, mercantile or agricultural lease, wherefore it, too, obviously issues out of the land, within the legal meaning of the terms. No au-

thority says it issues out of the estate or other right granted and I have not said so. The terms of the definition, requiring it to "issue out of land", are satisfied, when the right, rent, comes to the owner of the land in return or compensation for some estate granted out of his land or some right granted by him, to use his land.

I am authorized to say that Williams, President, concurs in all I have said on this subject.